UNITED STATES of America
v.
Nicholas J. NARDIELLO, Jr., Appellant.

UNITED STATES of America
v.
Alfred SALERNO, Appellant.

Nos. 13709, 13710.

United States Court of Appeals Third Circuit.

Argued Feb. 5, 1962.

Decided June 6, 1962.

Michael A. Querques, Orange, N. J., for Nicholas J. Nardiello.

Malandra & Tomaselli, by Angelo D. Malandra, Camden, N. J., Joseph Tomaselli, Camden, N. J., of counsel, on the brief, for defendant-appellant, Alfred Salerno.

Sanford M. Jaffe, Asst. U. S. Atty., Newark, N. J. (David M. Satz, Jr., U. S. Atty., Newark, N. J., Ralph J. Kmiec, Asst. U. S. Atty., Camden, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and Mc-LAUGHLIN and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

An appeal has been taken by Nardiello at our No. 13709 and an appeal by Salerno at our No. 13710. Both appeals may be disposed of in one opinion since the conspiracy with which both defendants were charged grew out of the same still operation in New Jersey. Both Nardiello and Salerno were indicted on five counts with a number of other defendants as co-conspirators. The first count alleged a conspiracy to carry on the business of a distiller of spirits without giving bond, to possess an unregistered still, and to make and ferment mash for distillation of alcohol on premises other than an authorized distillery. 26 U.S.C.A. §§ 5606, 5174(a), and 5216(a). See 18 U.S.C. § 371. Seven overt acts were set out in the indictment. As to Salerno, the overt act alleged was that he had purchased five hundred 5-gallon can cartons from the Elbee Excelsior Company of New Jersey. As to Nardiello, the overt act relied on was that he had purchased on March 2, 1959, a fourteen room house, the still site, at Tenth and Upland Avenue in the outskirts of Absecon Highlands, in Atlantic County, New Jersey from James Balestrieri, the then owner.

Nardiello and Salerno and another defendant, Memoli, were tried together but in advance of the other defendants. At the close of the government's case the trial court granted a motion for judgment of acquittal as to Memoli on all five counts and granted motions for judgments of acquittal as to Nardiello and Salerno on the last four counts of the indictment but denied them judgments of acquittal on the conspiracy count. The trial was proceeded with and, before the case was sent to the jury, Nardiello and Salerno renewed their motions. These were again denied and both defendants were found guilty. Motions for new trials were made and were denied. Judgments of sentence were imposed and the appeals at bar followed.

The issue presented is whether or not there was sufficient evidence presented to the jury to sustain the convictions of Nardiello and Salerno. We conclude as to Salerno that the evidence was sufficient but we are of the contrary view as to Nardiello.

A statement of facts is necessary. Since the defendants were found guilty, we accept those inferences to be drawn from the evidence which are most favorable to the United States. On December 28, 1959, Walsh, an alcohol-tax investigator, approached the premises proved to be owned by Nardiello at Tenth and Upland Avenues and smelled a strong odor of disinfectant and fermenting mash. The following evening this investigator returned to a point near the premises and again smelled the odor of fermentation. He also saw a black Chrysler automobile with the New Jersey license number DC 60 stop in front of the premises, discharge a passenger, and then leave. He observed a red box-type truck enter the same premises and drive away soon thereafter. Little, another investigator, at 5 P.M. on the same day, December 29, saw the same Chrysler automobile about a mile-and-a-half distant from the Nardiello property. He also saw the red box-type truck and saw the Chrysler blink its lights and the truck blink its lights in return, the truck then following the Chrysler down the road. There was evidence from another investigator, Slayman, of conversation on December 31, 1959, between the drivers of the truck and the Chrysler and Slayman stated that thereafter the two vehicles proceeded to follow, pass or wait for each other in comparatively close harmony.

The premises were raided by members of the Alcohol Tax Unit at about 5:00 P.M. on December 31, 1959. Fenton, the Chief of Police of Galloway Township, testified that he saw the Chrysler followed by the truck on December 31, about fifteen minutes before the raid, approximately a half mile from the still and that the same truck, containing sugar and empty cartons, was found on the premises following the raid. A number of individuals, named as co-conspirators with Nardiello and Salerno, were arrested at the still following the raid. There

is no doubt but that a still was being operated illegally on Nardiello's property.

The United States presented the following evidence specifically directed against Salerno in order to connect him with the conspiracy. Bush, an alcohol-tax investigator, testified that he saw Salerno driving the black Chrysler with the license tag DC 60 approximately 100 yards from the premises where the still was found, about five minutes prior to the raid. Reilly, a New Jersey State policeman, arrested Salerno in the Chrysler approximately four miles from the still site shortly after the raid.

Gill, office manager of the Hinde & Dauch Division of the West Virginia Pulp & Paper Company, testified that his division manufactured cartons of the size and kind found at the still site, marked "Hinde & Dauch, Hoboken, New Jersey", and that the symbols "JC" were stamped on each carton to indicate that the cartons were manufactured in October of the year 1957. He stated that in October 1957, Hinde & Dauch received an order for cartons from Elbee Excelsior Company of Newark, New Jersey, and that Hinde and Dauch shipped to Elbee 4,279 cartons on October 29, 1957, each carton marked as we have indicated. Leslie, a vice-president of Elbee, testified that 500 of these cartons were sold by Katherine Sangster, an employee of Elbee, for cash, and Allen, a shipping clerk, testified that on the occasion of the sale, some time in October, 1959, he helped an individual, whom he identified as Salerno, put the cartons into his car, a "black Buick". More than two hundred cartons of the same size and kind as those sold by Elbee to Salerno and marked as indicated, were found at the still site immediately after the raid. Some similar cartons were also found in the red box-type truck.

■ On the basis of this circumstantial evidence the jury found Salerno guilty. Salerno insists that the trial court erred in refusing to charge that where the government's evidence is circumstantial it must be such as to exclude every

reasonable hypothesis other than that of guilt. This was once the law but it is so no longer. In Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), the Supreme Court made it clear that circumstantial evidence and testimonial evidence are intrinsically no different in respect to the inferences to be drawn therefrom. Mr. Justice Clark stated: "Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inferences. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

■ We can require no more in the case at bar. We conclude that the evidence, although far from overwhelming, was sufficient to demonstrate beyond a reasonable doubt that Salerno was an active participant in the conspiracy. Consequently, the judgment of conviction will be affirmed as to him. See United States v. Allard, 240 F.2d 840 (3 Cir. 1957), cert. denied, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957); United States v. Giuliano, 263 F.2d 582 (3 Cir. 1959), in which this court followed the decision of the Supreme Court in the Holland case. Cf. United States v. Carlucci, 288 F.2d 691 (3 Cir. 1961), cert. denied, 366 U.S. 961, 81 S.Ct. 1920, 6 L.Ed.2d 1253 (1961).

The other points raised by Salerno do not require discussion.

We will now review the evidence against Nardiello, again accepting those inferences which are most favorable to the United States. It was proved without contradiction that Nardiello owned the land and the house on which the still operations were conducted. The government offered testimony that Nardiello told the prospective seller, Balestrieri, that he intended to purchase the premises for the use of relatives who were to ar-

rive from Europe.[1] On March 31, 1959, however, he signed a lease with Memoli, the individual named as a co-defendant. Nardiello released Memoli from the obligation of his lease in June 1959 and subsequently, on October 1, 1959, rented the premises to Albert Pinto.

The government offered proof by an expert witness, an examiner of questioned documents employed by the United States Treasury Department, that the letter allegedly written by Pinto in response to Nardiello's advertisement in the New York Times and those sent to Nardiello by Pinto's references were typed on the same typewriter by the same person. There was also proof that the letters which Nardiello asserted that he sent to Pinto's references were addressed to hotels at which the addressees were not present at the time of mailing. And yet the prompt replies to Nardiello gave these hotels as return addresses. It is undisputed that Nardiello ordered bottled gas for the house in which the still operation was conducted for the period commencing February 27, 1959 and ending February 11, 1960. He was billed also by the electric company for the current consumed there from March 2, 1959 to January 30, 1960. He paid these bills and it is clear that the amounts charged for electricity increased in the last quarter of 1959.[2]

There is also evidence of what the government terms "unusual activities" around the premises after Nardiello purchased them. For example, there is evidence of a 500 to 1000 gallon tank having been seen on a truck parked near the house shortly after Nardiello had acquired it in March, 1959. A rural mail carrier testified that toward the end of April or May, 1959, sheets of plywood were extended from the end of the porch, around the side of the porch, and that two men were working behind them. On March 23, 1959, an employee of the New Jersey Bell Telephone Co. went into the cellar of the house with Memoli looking for a fuse protector to be employed in connection with the installation of a telephone and discovered that the cellar ceiling was covered with a rough coat of plaster and that there was a bulkhead across the middle of the cellar. This partition had not been present when the property was sold to Nardiello. The Bell Telephone employee testified that he could not get to the other side of the bulkhead to find the fuse protector because Memoli did not, or said that he did not, have the key to that portion of the cellar. The telephone employee stated that Memoli told him that the Balestrieri family had deposited their furniture in the partitioned part of the cellar and that the Balestrieris had the key.

■ The evidence must be of such a kind or quality as to permit a jury to find beyond a reasonable doubt that the landlord, Nardiello, knew of and contributed to the conspiracy. See United States v. Dellaro, 99 F.2d 781 (2 Cir. 1938). We conclude that the above facts do not meet this standard. Obviously, the enumerated circumstances give rise to considerable suspicion, but suspicion is inadequate. The deficiency in the government's case lies in the failure to prove knowledge on the part of Nardiello that his acts "innocent in themselves" were aiding the conspiracy. United States v.

---

1. Nardiello testified that he made this statement in order to obtain a more favorable price. He stated, however, that he really wanted the property for "development and speculation". It appears from the record that at the time of the purchase from Balestrieri, Nardiello owned more than a dozen other properties in New Jersey.

2. The billings for the fall and winter of 1959–60 were as follows:
9- 8-59 to 10- 8-59—496 KWH—$13.29
10- 8-59 to 11- 9-59—862 KWH— 19.99
11- 9-59 to 12-11-59—936 KWH— 21.34
12-11-59 to 1-11-60—790 KWH— 18.67
The consumption during the Memoli tenancy and the summer period was:
3- 2-59 to 3-10-59— 46 KWH—$ 1.71
3-10-59 to 4- 9-59—352 KWH— 10.65
4- 9-59 to 5-11-59—563 KWH— 14.52
5-11-59 to 6- 9-59—488 KWH— 13.14
6- 9-59 to 7- 9-59—206 KWH— 7.27
7- 9-59 to 8- 7-59—228 KWH— 7.84
8- 7-59 to 9- 8-59—252 KWH— 8.46

Rappaport, 292 F.2d 261, 264 (3 Cir.), cert. denied, 368 U.S. 827, 82 S.Ct. 48, 7 L.Ed.2d 31 (1961).

The record is barren of any association by Nardiello with any of the alleged conspirators, other than Memoli and Pinto, the two tenants of the property. Compare United States v. Monticello, 264 F.2d 47, 49 (3 Cir. 1959). Although Nardiello's two or three visits to the premises subsequent to the termination of the Memoli tenancy provide support for the inference that he must have discovered the results of at least some of the "unusual activities", this awareness cannot be equated with knowledge of the conspiracy. These activities were innocuous on their face, and the timing of Nardiello's visits to the property was not such as to invite a different characterization when they became known to him. The still was discovered in operation no earlier than December 28, 1959. The testimony placed Nardiello inside the house no later than September 15, 1959, when he exhibited the premises to Pinto. The evidence attempting to link the landlord with the enterprise after this date is his monthly receipt of the electric bills, which increased in amount during the final months of 1959, a time of year when an increase is not abnormal. We find this circumstance "too vague and inconclusive" to support a finding of conscious furtherance of the conspiracy on the part of the defendant. Cf. United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

■ The only remaining evidence of any substance against Nardiello concerns the letters relating to the leasing of the house to Pinto in September, 1959. There is ample basis for a jury finding that the reference letters were shams. However, it is unexplained how this necessarily implicates Nardiello in the plot, as opposed to Pinto. It is true that Nardiello may have manufactured the letters and the Pinto tenancy in an attempt to insulate himself from detection as a coconspirator. But this is merely a possibility, not a logical inference. The government's case, considered in its entirety, is too speculative to support the jury's finding that Nardiello knew of the conspiracy and participated therein. See United States v. Falcone, supra; Dennert v. United States, 147 F.2d 286 (6 Cir. 1945).

The judgment against Salerno will be affirmed. The judgment against Nardiello will be reversed.