**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William WRIGHT, Defendant-Appellant.**
**No. 13572.**

United States Court of Appeals
Seventh Circuit.

Oct. 31, 1962.

Rehearing Denied Dec. 12, 1962.

736

Myer H. Gladstone, Chicago, Ill., for appellant.

James P. O'Brien, U. S. Atty., Raymond F. Zvetina, Asst. U. S. Atty., Chicago, Ill., for appellee; John Peter Lulinski, Asst. U. S. Atty., of counsel.

Before DUFFY, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Defendant, William Wright, appeals from a judgment sentencing him to a term of imprisonment. He was convicted by a jury on three counts of an eleven count indictment charging violation of the Federal Narcotic Laws. Two of these three counts charged defendant and one Michael Carioscia with receiving, concealing, facilitating the transportation of and selling a quantity of heroin in violation of 21 U.S.C. § 174, and 26 U.S.C. § 4705(a). The third count charged a conspiracy to violate § 174, supra, by defendant and codefendants Carioscia, Arman-

do Pennacchio, and Ben Pennacchio. Armando Pennacchio and Carioscia pleaded guilty. Ben Pennacchio was found not guilty by the jury.

 Defendant contends that the evidence was not sufficient to support his conviction. Consideration of this contention requires a summary of the facts.

During the year 1960 defendant resided in Coytesville, New Jersey. Between February 17 and March 24, 1960 there were six long-distance telephone calls to defendant's wife's unlisted telephone in Coytesville from Armando Pennacchio's telephone in Chicago.

On March 16, Carioscia and Armando Pennacchio sold 120 grams of heroin to Federal Narcotics Agent Theisen. On March 31, defendant and Carioscia traveled from Chicago to New York under assumed names. On April 28, Carioscia sold 75 grams of heroin to Agent Theisen. The next day there was a telephone call from Armando Pennacchio's residence to defendant's residence in New Jersey.

On May 25, defendant registered at The Country Club Motel, Melrose Park, Illinois, under the assumed name "J. Harris." On May 28, Agent Theisen with Oscar Luna, a special employee of the Federal Bureau of Narcotics, talked with Carioscia at the bar of The North Avenue Steak House, Chicago. Theisen told Carioscia that he did not have the full price for a quarter kilogram of heroin and asked if he could get the heroin and pay later. Carioscia said he would have to talk to his "man" about it, and that "the man's right here." Theisen and Luna then left the Steak House, whereupon Carioscia entered the restaurant section of the establishment and talked to defendant. Wright later left with Carioscia in the latter's car and went to The Country Club Motel. About noon Carioscia telephoned Agent Theisen that he had talked to the "guy" right after Theisen and Luna left the night before and the arrangements were off. The following day there were calls from Wright's motel room to the residences of

Carioscia and Benjamin Pennacchio. Defendant checked out of The Country Club Motel on June 2.

On June 6, Carioscia told Agent Theisen that he wasn't sure they had enough heroin on hand, and the following day Armando Pennacchio told Theisen they were temporarily "out" and would call when they got enough "to take care of the business." On June 13, defendant again registered at The Country Club Motel under the assumed name "J. Harris."

On June 16, Carioscia called Agent Theisen to make arrangements for another sale of heroin. Theisen told him that he had the money and was ready to do business. Carioscia said he would call between 8:30 and 9:00 p. m. At approximately 7:00 p. m. Carioscia left his residence in his Pontiac. At 8:00 p. m. this car was observed in the parking lot at The North Avenue Steak House and twenty minutes later defendant and Carioscia were seen seated together at the bar. Shortly thereafter, Wright left the Steak House, entered an Oldsmobile and was seen pulling out of the lot. He returned within an hour, walked up to Carioscia, handed him some keys, and said "Everything is O. K." Carioscia went to the telephone, returned and told Wright that the phone was busy. Carioscia telephoned again, and talked with Agent Theisen who had been awaiting his call. He told Theisen to go to The Lake Club in Melrose Park; Carioscia then left the Steak House. Although his Pontiac was still in the lot, Carioscia drove away in the Oldsmobile and later met Theisen at The Lake Club where he delivered 235 grams of heroin.

Meanwhile, at the Steak House defendant paced back and forth, glanced out the door, walked outside, returned, and finally entered the restaurant section. About 10:15 p. m. Carioscia returned, looked around the bar, walked to the restaurant section, stood, nodded his head, and entered the restaurant where he talked with defendant. Carioscia then left in his Pontiac. Two days later defendant checked out of The Country Club Motel.

On July 7, 14, and 15, there were long-distance telephone calls from Armando Pennacchio's residence to defendant's residence in New Jersey.

On July 26, Carioscia told Agent Theisen that he was not then in a position "to do business," but asked him to check back the first part of August. On August 4, there were three long-distance telephone calls from Carioscia's residence to defendant's residence. On August 6, there was a long-distance telephone call from Armando Pennacchio's residence to Wright's. On August 27, Armando Pennacchio told Theisen that Carioscia and "that other guy" had lost the "stash" and had practically destroyed him in the last several weeks, but that he could supply a "kilogram and a half." On August 29, Armando Pennacchio delivered 198 grams of heroin to Theisen and on September 6, 407 grams.

On September 12, a short time after his arrest, defendant expressed surprise to Agent Theisen at the degree of surveillance to which he had been subjected by the federal agents during the course of the government's investigation. He also registered an apparent complaint against one of his codefendants by saying, "He never did use his mind. * * * I told that guy to watch you. I told him then you were an agent." Defendant then asked Theisen, "How much stuff did they get Monsie (Armando Pennacchio) with?"

A review of the evidence convinces us that it is sufficient to warrant the jury's verdict of guilty on both the substantive and the conspiracy counts.

It is true that no one saw defendant handle any heroin. However, as was stated in United States v. Rossi, 219 F.2d 612, 614 (2nd Cir. 1955):

> "The courts have held again and again in the narcotics cases that it is not necessary for the government to produce a witness who saw the package containing narcotics handed over. * * * Otherwise it would never be possible to convict those who participate in this despicable

business, each of whom is continually on the alert against the possibility of detection and apprehension."

The jury was justified in inferring from the short trip by Wright in the Oldsmobile on June 16, followed by the calls to Agent Theisen by Carioscia, and then the taking of the Oldsmobile by Carioscia to The Lake Club to make the sale, that Wright had originally left to pick up the heroin, had hidden it in the Oldsmobile (and referred to this fact when he tossed the keys to Cariosca and said "Everything is O. K."), and that Carioscia took the Oldsmobile with the heroin to The Lake Club for the sale to Theisen. We find nothing unreasonable in such an inference when the facts are viewed in their totality.

Next we consider defendant's contention that the government attorneys made prejudicial and inflammatory remarks to the jury, distorted the evidence, and reflected upon the integrity and conduct of defendant's attorney. We have examined each instance of claimed prejudicial conduct and are unable to see how any of them would warrant a conclusion that the jury's verdict may have been influenced thereby. In those few instances where there may have been some doubt, the trial court sustained objections to the comments of the prosecutors.

Furthermore, defendant did not move for a mistrial. It has generally been held that improper conduct of a prosecutor does not require a reversal where the trial court properly instructs the jury to disregard it and where the defendant fails to pursue the matter by moving for a mistrial. Gerard v. United States, 61 F.2d 872 (7th Cir. 1932).

Defendant also contends that reversable error resulted from government counsel's alleged reference to defendant's failure to testify in his own behalf.[1] The Supreme Court has held that the Fifth Amendment and 18 U.S.C. § 3481 preclude any comment or argument about a defendant's failure to take the stand in a criminal trial. Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941 6 L.Ed.2d 84 (1961). This rule, however, must be interpreted in the light of reason and it must appear that "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Knowles v. United States, 224 F.2d 168, 170 (10th Cir. 1955). We are in accord with what was said in Langford v. United States, 178 F.2d 48, 55 (9th Cir. 1949):

> "[E]xcept in those special cases where it appears that the accused

---

1. This arises out of the following exchange during the closing argument by government counsel to the jury:

Government Counsel: "Every act in this case has been designed by these two defendants with you in mind. How do I mean that? Every act, every transaction, every declaration is designed 'That if we get caught, how we have insulated ourselves from the ladies and gentlemen of the Federal Jury in this courtroom? How have we done that?'

"Now keep in mind that nothing I have said, or anything that the other attorneys have said in this case is evidence. You heard the evidence from the witness stand under oath, and as to Defendant William Wright it is unrefuted and undenied. Out of one hundred and seventy million people in the United States not one witness took that stand to refute the Government's case. Not from New York or anywhere they would come."

Defense Counsel: "Just a minute. Your Honor, I want to object to that statement when he says no witness took that stand for Mr. Wright. That includes him and that is an improper remark."

\* \* \* \* \*

The Court: "I understand but the jury is going to be instructed to the fact that Mr. Wright did not take the stand and that cannot be considered against him. It is not necessary for him to take the stand if he doesn't want to."

Later, in the closing argument, government counsel addressed the jury:

"But he was so sure every step of the way, insulated, please, from you ladies and gentlemen, so he feels free to go ahead and operate because he has got Michael Carioscia out in front to handle the hot stuff. That is why he felt he could go ahead with it. The slick Bill Wright carefully insulating himself against any evidence from that witness stand."

himself is the only one who could possibly contradict the government's testimony, \* \* \* the prosecutor may properly call attention to the fact that the testimony of the government witnesses has not been contradicted."

We cannot agree that the language of government counsel under attack was manifestly intended to convey or would have naturally conveyed an improper insinuation to the jury. The language was a general comment on the fact that the government evidence was totally unrefuted. Defendant was not the only one who could have contradicted the government's testimony. The evidence shows that others were present during several of the conversations or incidents relied on by the government in support of its case against defendant.

■ In any event, we feel that one of the court's instructions [2] was sufficient to correct any misinterpretation that may have resulted from the comments of government counsel. It is pertinent here to recall what Judge Augustus Hand said in United States v. DiCarlo, 64 F.2d 15, 18 (2nd Cir. 1933):

> "We should be blind to realities if we supposed that juries are unconscious of the omission of a defendant to take the stand, and we think the express instruction to the jury in this case, that this fact must not prejudice the defendant, did all that could ever be done to prevent the consideration by them of the omission in arriving at their verdict."

■ Finally, we come to defendant's contention that there was prejudicial misjoinder of substantive counts in the indictment in that other codefendants were charged with separate offenses not participated in by defendant. For this contention to be valid, the conspiracy count, the connecting link of the substantive counts in the indictment, must have

failed for lack of proof. Since the conspiracy was proved, this contention of necessity must fail. See Rule 8, F.R. Crim.P.

The judgment of the District Court is affirmed.

---

2. "The fact that a defendant did not testify in his own behalf in this case does not create any presumption against him, and the jury must not permit that fact to have the slightest influence in arriving at a verdict." (Defendant's Instruction No. 20.)