**UNITED STATES of America,**

v.

**Alvin BEIGEL, Joseph Lapi, Anthony Cutillo, Anthony Verzino and Vincent Soviero, Defendants.**

**No. 65 Cr. 174.**

United States District Court
S. D. New York.

May 11, 1966.

Robert M. Morgenthau, U. S. Atty. for the Southern Dist. of New York, New York City, for United States, Andrew M. Lawler, Jr., Asst. U. S. Atty., of counsel.

Albert Krieger, New York City, for defendant Alvin Beigel.

Irwin L. Germaise, New York City, for defendant, Joseph Lapi, Harold O. N. Frankel, New York City, of counsel.

Michael A. Querques, Orange, N. J., for defendant, Anthony Cutillo.

Stone & Diller, New York City, for defendant, Anthony Verzino, Joseph I. Stone, New York City, of counsel.

WEINFELD, District Judge.

This case has been tried to the court, the defendants having waived trial by jury. Those on trial are Alvin Beigel, Joseph Lapi, Anthony Cutillo and Anthony Verzino. The indictment also named a fifth defendant, Vincent Soviero, but a severance was granted as to him.

The indictment contains three separate counts. The first charges all five defendants with a violation of sections 173 and 174 of Title 21, United States Code. The third count charges them with a conspiracy to violate the same sections. The second count charges the defendants with a conspiracy to violate sections 4705(a) and 7237(b) of Title 26 by the sale, barter, exchange and giving away of narcotic drugs not in pursuance of a written order

on a form issued by the Secretary of the Treasury. The same overt acts are charged in each conspiracy.

The substantive count centers about a substantial quantity of heroin, more than two kilos, found upon the person of the defendant Beigel shortly after 3 a. m. on March 22, 1963. The government charges that this episode and events preceding it involved not only Beigel, but the other defendants, and were the final act in the conspiracies. Thus, we go back to earlier events to fill out the entire picture.

The case is rather unique in that it does not follow the now familiar pattern of evidence in narcotics cases. The government does not rely upon the testimony of any undercover agent who allegedly engaged in a direct transaction with one or more of the alleged co-conspirators, nor of any informer who introduced a government agent to defendants or was present at any claimed transaction. With the exception of the final incident on March 21–22, 1963, when heroin was found upon Beigel, the evidence submitted to support the charges consists of overheard conversations and acts and conduct which do not involve any direct sale of narcotics, but which the government alleges nonetheless fully establishes that the defendants were acting in concert to violate the narcotics laws.

## THE GOVERNMENT'S CASE

The opening scene occurs on February 5, 1963 at the Dawn Food Shop, located on Second Avenue, south of 51st Street, New York City, where Verzino is engaged in conversation with a "John Doe" who is never identified. According to Roy Cahill, a New York City detective and a member of a joint federal and state investigating group, Verzino stated to John Doe, "I told him $5500, no less," and after a break in the conversation, because the agent was unable to hear it, Doe said, "You know, you have to be careful in this business."

Soon thereafter Soviero, the defendant as to whom the indictment was severed, joined Verzino and Doe, and another officer, Francis Meehan, also a New York City detective, sitting alongside the trio, heard Doe ask, "Is it in the same place, in the ashtray," to which Soviero responded, "Yes, right behind the ashtray," whereupon Doe said, "I will see you tomorrow with the money." Doe then left the restaurant and was followed to Third Avenue and 47th Street, where he entered an old Dodge car, license plate QN 3613, and was observed, according to the agents, reaching down under the dashboard, following which he drove off. This car comes into the picture again on February 21, 1963.

Later that evening, February 5, still according to government testimony, at another restaurant, the Joker, located on East 49th Street, the defendants Verzino and Soviero were again overheard, this time by Chantland Wysor, a federal narcotics agent, who was seated alongside of them at the bar. Verzino, in answer to a question or statement by Soviero, stated, "For that guy we charge 7500," to which Soviero replied, "That's right," and then asked, "Did Al mix the stuff good," to which Verzino responded, "Yes, he mixed it three to one and it's still dynamite." The narcotics agent testified that three to one is the argot of narcotics traffickers for dilution of heroin, and means three parts of an adulterant to one part of heroin, and dynamite indicates the high quality of the drug. "Stuff" is accepted jargon in the illicit drug world for narcotics.[1]

The next incident in the development of the government's case occurred about 9 p. m. on February 21, again at the Dawn

---

1. Compare United States v. Bentvena, 319 F.2d 916, 927, 929 (2d Cir.), cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Wright, 309 F.2d 735, 737 (7th Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 873, 9 L.Ed. 2d 733 (1963); United States v. Massiah, 307 F.2d 62, 67–68 n. 4 (2d Cir. 1962), rev'd on other grounds, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); United States v. Williams, 239 F.2d 517, 518 (2d Cir. 1956).

Food Shop. Present there were Verzino, Soviero and Beigel, who were soon joined by the same John Doe described in the incident of February 5. After a conversation, Verzino and Doe crossed the street to a parked car, from the trunk of which Verzino removed a large package which he handed to John Doe, following which Verzino rejoined Soviero and Beigel. Soon thereafter Beigel left the codefendants and was observed driving away in the old Dodge car, bearing license plate QN 3613, the same car which John Doe had driven away on February 5, when he had leaned under the dashboard. Later that evening Beigel returned to the area, and after conversing briefly with Verzino and Soviero, drove off, but this time in a tan Buick car. He was followed by surveillance agents over the Queensboro Bridge into Queens, where the trail was dropped.

Federal agents and the New York City police authorities were engaged during this period in active surveillance of all the defendants. On February 28, at about 10 p. m. at the I.D. Lounge, located on 58th Street near Second Avenue, New York City, Verzino and Soviero were again overheard. According to narcotics agent James O'Connell, who was seated near them, Soviero said, "I called his place and left a message for him in case he calls. I told him to stay where he is and Al will meet him and deliver—bring the stuff." whereupon Verzino said, "Suppose he leaves," and Soviero replied, "He will probably go to his place, and she'll tell him to go back." Verzino then said, "How come Al is late," and Soviero replied, "He had that delivery at 8 o'clock." The defendants engaged in other conversation, but this was the only portion heard.

About an hour and a half later Beigel, who had been under fairly constant surveillance that day, joined Soviero and Verzino at the I.D. Lounge and after conversing with them left and proceeded over the 59th Street Bridge into Queens, where surveillance was dropped.

The next significant date in the government's proof was March 14, 1963.

Beigel had been followed from his home in Brooklyn to the vicinity of 58th Street and Second Avenue, New York City, where he met the defendant Soviero, after first parking a Rambler car in which he had driven from his home. He later moved the car to East 62nd Street, where in his absence an investigating agent dusted a fluorescent powder on the door handle. When Beigel re-entered the Rambler some time later he was followed to 37–41 79th Street, Queens, where agents, testing all the doorknobs in the building with a fluorescent light, got a positive reaction from the doorknob of apartment 2C, indicating the presence of the same fluorescent powder which had been placed on the handle of the Rambler car on East 62nd Street earlier that evening. The government also offered proof that Beigel had rented the car the day before from All Boro Car Leasing, Inc. on a daily basis.

Events came to a climax one week later, March 21, when for the first time the defendants Lapi and Cutillo, according to government witnesses, entered the picture, as a result of which they, too, were charged as co-conspirators and participants in the substantive crime. At about 7:30 that evening a Rambler car, but bearing a different license plate number from the one seen a week earlier, was observed on York Avenue between 60th and 61st Streets, Manhattan. It was not known who had parked the car there, but the evidence indicates it had been rented that day by Alvin Beigel from the All Boro agency, the same company from which he had rented a Rambler car the week before.

Soon after it was first observed, according to government witnesses, Verzino and Soviero drove by in a Jaguar car. As they approached the parked Rambler, they came to an almost complete stop, looked at the Rambler and continued on their way. About 8:30 p. m., approximately an hour later, surveillance officers testified that the defendant Lapi entered the Rambler and drove off. Whether or not Lapi is the man who drove the car and participated in the acts

referred to hereafter is one of the vital issues in the case. In any event, the Rambler car was driven by a circuitous route to the south side of 58th Street, west of Sutton Place, and parked there.

Lapi, according to government witnesses, then proceeded on foot in the direction of the Cheer Club, located on Second Avenue between 57th and 58th Streets. Surveillance was established across the street, at which point at least one officer had binoculars. Lapi, over the period of the next several hours, was observed in and out of the Cheer Club, apparently looking for somebody. Meanwhile a government agent had looked inside the Rambler car with a flashlight, but had observed nothing on the seats or floor. Finally, at 12:10 a. m., now March 22, a blue Buick car, bearing New Jersey license plate number HDD853, double parked near the Cheer Club. In addition to the driver, an unidentified individual described as another John Doe was also seated in the front of the car.

The government contends the driver of the Buick car was the defendant Anthony Cutillo. Again, whether Cutillo was the driver is a vital and challenged issue.

Detective Cahill, one of the surveillance agents, testified that he stood near the double parked car and heard Lapi ask the driver, whom Cahill identified as Cutillo, "What happened to you? We got them hung up," to which Cutillo responded, "I got hung up myself." Lapi also asked about the passenger in the car and was assured by Cutillo he was "all right."[2] Lapi then entered the Buick, was seated in the rear, and the car was driven to 58th Street and Sutton Place, where it was double parked toward the northerly side of the street, about a car length to the rear of the Rambler, then adjacent to the southerly curb where Lapi had previously parked it. According to various government witnesses, the driver handed a brown paper bag, about 15" x

15", to Lapi who, with the bag in his hand, got out of the double parked Buick, crossed over to and opened the door of the Rambler car, closed it and no longer had the bag. He then walked to the corner to which the Buick car had proceeded in the meantime, entered it and was driven to First Avenue, where he got out. The car then proceeded up First Avenue to the 60's, where surveillance was discontinued.

During this time the still parked Rambler car was kept under constant surveillance by federal agents and city police. Several hours later, at 2:15 or 2:30 a. m., March 22, Beigel, according to government witnesses, entered the Rambler and drove to the area of 37–41 79th Street, where he parked and was observed leaving the car carrying a brown paper bag similar to that placed in the Rambler car at about 12:10 a. m. Beigel then entered the building at 37–41 and, after he had inserted the key in the lock of the door to apartment 2C and was at the threshold about to enter, was placed under arrest by New York City detective Cahill. The brown paper bag, openly exposed and still in Beigel's hand, was seized from him by Cahill. He was immediately joined by other federal and city officers and a search was made of apartment 2C, in which was found a traveling suitcase, the contents of which included bags containing two kilos of heroin and full narcotic cutting equipment and paraphernalia for packaging narcotics for distribution to the retail trade. The bag found on Beigel's person also contained about two kilos of heroin.

This, in broad outline, constituted the government's case. Upon its close each defendant moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Assuming the truth of the government's evidence, and giving it the benefit of all legitimate and reasonable inferences to

2. Compare United States v. Agueci, 310 F.2d 817, 823–824, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 4016, 10 L.Ed.2d 12 (1963).

be drawn therefrom,[3] their motions were denied, except that (with the consent of his counsel) decision was reserved on Verzino's motion with respect to count 1, the substantive count. Thereupon, the defendants went forward.

## THE DEFENSE

### Defendant Verzino

The defendant Verzino entered a blanket denial that he had committed the crimes charged in the indictment. He categorically denied he had conspired either with any defendant upon trial or with the defendant Soviero; he denied participation in the substantive offense; he denied he knew or had ever seen the defendant Cutillo prior to this trial.

Verzino testified that although he knew several persons by the name of Al, he did not refer to the defendant Beigel as Al, but always as Beigel, believing that was his nickname. He also testified he knew Lapi and saw him quite frequently at the Cheer Club, which he believed Lapi owned; that they met there socially and bought one another drinks. He acknowledged he knew Soviero for fifteen years and that they were close friends.

While Verzino readily admitted dealing in narcotics, he denied he had ever had any such transactions with Soviero, Lapi or Beigel. His own direct examination further developed that for five years preceding the indictment period his sole income came from criminal activities which included narcotics transactions, thefts, assaults with weapons, bookmaking and "shylocking"; also that he had associated with criminals his entire life. He also testified upon direct examination as to his criminal record, which extends to a state narcotics conviction in 1965, felonious assault, illegal entry, and a parole violation; that for his misdeeds he had served some ten years in prison.

Prior to the conspiracy period Verzino testified he knew detectives Cahill and Meehan, two of those who had testified as to overheard conversations, because they had stopped him on one occasion in 1960 for questioning and Cahill on several other occasions thereafter had followed him. The clear thrust of his testimony is that he would not have been so foolhardy as to discuss illicit matters within earshot of known police officers. He also denied he ever discussed narcotics or narcotics transactions in public places in the presence of strangers, which would include three government witnesses, other than Cahill and Meehan, who testified to overheard conversations. But he admitted he frequented the bars, food shops and lounges where the claimed conversations were overheard; also that he visited the Cheer Club fairly regularly.

### Defendant Lapi

Lapi also categorically denied the charges against him or that he ever had engaged in any narcotics dealings; he further denied that he ever knew or had ever seen Beigel or Cutillo until after his arrest on the current charges; he also denied he knows Soviero. Lapi also testified that he was the owner of the Cheer Club, although not registered as such; that he knew Verzino as a customer who came there to drink, and that they bought one another drinks.

He specifically denied that he drove the Rambler car on March 21 from its original parked position on York Avenue between 60th and 61st Streets to 58th Street and Sutton Place; that he had ever had any conversation outside the Cheer Club with the driver of a blue Buick car; that he ever entered such a car; that he had received any brown paper bag or package from the driver, or that he put such a package in the Rambler car parked on 58th Street.

Lapi upon his direct examination testified that he had been convicted upon a plea of guilty of a Sherman Act antitrust violation, upon which sentence had been suspended, and of robbery, also upon a

---

**3.** See United States v. Cascade Linen Supply Corp., 160 F.Supp. 565, 568 (S.D. N.Y.1958), rev'd on other grounds, United States v. Consolidated Laundries Corp., 291 F.2d 563, 574 (2d Cir. 1961). Accord, United States v. Wapnick, 202 F.Supp. 712, 715 (E.D.N.Y.1962).

plea of guilty, for which he had served eleven years.

### Defendant Cutillo

Anthony Cutillo testified that since his arrest on the pending charges, which did not occur until December 1963, he had tried to recall where he was on the night of March 21–22, 1963. While unable to specify where he was that evening, he denied that he was in the vicinity where one government witness identified him as the driver of a blue Buick car; that he ever drove his brother's blue Buick car; that he participated in any of the events which involved Lapi; or that he ever engaged in any narcotics transactions.

Cutillo, a resident of New Jersey, testified he first saw Lapi in the courtroom of this building when the case was called, apparently to set a date for trial; that subsequently he first saw the defendants Beigel and Verzino; that he does not know a person by the name of Soviero.

Cutillo on his direct examination acknowledged that he had previously been convicted of transporting a stolen interstate shipment, for which he had been placed on five years probation.

### Defendant Beigel

Beigel did not testify on his own behalf. His counsel, however, renewed a pretrial motion made pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure and denied by Judge Palmieri to suppress the heroin seized from Beigel upon his arrest, as well as the additional heroin and cutting and packaging paraphernalia found in the apartment. Upon the trial additional evidence was offered in support of the renewed motion. This court, at the close of the entire case, denied the renewed motion and now details its reasons therefor.

The motion rested upon a contention that the seizure of the heroin from Beigel's person at the threshold of the apartment, and thereafter of the suitcase within the apartment, occurred before any arrest was made and hence was not incidental to an arrest. Detective Cahill, who was one of the investigating group and earlier had observed the events preceding Beigel's entry into the Rambler car, and thereafter trailed him from Manhattan to Queens, testified, however, that just as Beigel had inserted the key and was opening the door of apartment 2C, he shouted, "Hold it Al. You are under arrest." Thereupon he seized the package from his person. Cahill's testimony in large measure is corroborated by other officers and agents. While it is true Detective Meehan, who with others immediately joined Cahill, displayed a New York State warrant authorizing a search of the premises and of Beigel, to which reference is hereafter made, the evidence here establishes the arrest of Beigel and the seizure of the heroin had already been made by Cahill.

Clearly the arrest of Beigel was lawful. Cahill, as did the other officers, federal and state, had abundant reasonable cause for believing that Beigel had committed a felony in violation of the federal narcotics laws;[4] further, that at the time of his arrest he was committing a crime in their presence.[5] The arrest being lawful, the search of Beigel's person incidental thereto was also lawful, even assuming arguendo, as Beigel's counsel argued, that he was not told in haec verba of his arrest until after the search;[6] nor is the arrest rendered invalid because Meehan and others assisted

---

4. See N.Y.Code Crim.Proc. § 183(2); United States v. Viale, 312 F.2d 595, 599–600 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963).

5. See N.Y.Code Crim.Proc. § 183(1); United States v. Viale, 312 F.2d 595, 599–600 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); United States v. Gorman, 36 F.R.D. 416,

418–419 (D.Conn.1965); Conti v. Morgenthau, 232 F.Supp. 1004, 1007 (S.D. N.Y.1964).

6. Cf. United States v. Gorman, 355 F.2d 151, 159–160 (2d Cir. 1965); United States v. Boston, 330 F.2d 937, 939 (2d Cir.), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964).

or participated.[7] Moreover, the fact that the agents believed that their right to search existed under what was subsequently held an invalid warrant is immaterial, since, entirely apart from the warrant, Cahill and the others had independent grounds of probable cause by reason of the events which occurred on the night of March 21–22, four days after the issuance of the warrant.[8]

■■ As to the additional heroin and the narcotics paraphernalia contained in the suitcase seized in the apartment itself, Beigel again contends that since the officers announced the apartment was being searched under the warrant subsequently vacated by the State Court, the suitcase and its contents must be suppressed. But as already noted, the invalidity of the state warrant is immaterial in view of the independent probable cause for Beigel's arrest which justified an incidental search. However, it is contended that the right to make an incidental search did not extend to the apartment proper, since Beigel was arrested at the threshold. The court concludes the search of the apartment, too, was incidental to the arrest. Beigel, the tenant of the apartment and so known to the officers, at the moment of his arrest was about to enter the apartment. He had power to grant or deny access to all seeking entrance to the apartment. Premises so subject to the dominion and control of a person just arrested may be searched as an incident thereto.[9] Parenthetically, it may be noted that once the heroin seized from defendant's person at the threshold of the apartment is held legally seized and admissible as evidence, in practical terms and end result it is of little consequence whether the other heroin and the narcotics paraphernalia is received in evidence.

■ Beigel makes a further contention that in any event the search was rendered invalid because the agents, one or two days before the arrest, had unlawfully gained entrance to and searched the premises. In support of this contention the defendant offered testimony of the superintendent of the apartment house that a day or two prior to Beigel's arrest, at the landlord's direction, he had admitted three men whom he believed to be FBI agents to apartment 2C by the use of a passkey; that the agents found a suitcase therein similar to the one now in evidence containing the contraband already described, but that they were unable to open it because of a combination lock, whereupon they left the suitcase intact in the apartment. The agents (those identified by the superintendent included Cahill and Meehan) deny making such a search. Even if they did, the testimony of the superintendent brought forth by Beigel, established that the claimed search yielded no evidence or leads and that the search made on the occasion of Beigel's arrest was in no way the fruit of any prior search. Accordingly, there is no basis for suppressing the evidence which was seized.[10]

7. Cf. United States v. Comi, 336 F.2d 856, 858 (4th Cir. 1964), cert. denied, 379 U.S. 992, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965).

8. See DiBella v. United States, 284 F.2d 897, 903–904 (2d Cir. 1960), rev'd on other grounds, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); Conti v. Morgenthau, 232 F.Supp. 1004, 1009 n. 15 (S.D.N.Y. 1964); United States v. Lodewijkx, 230 F.Supp. 212, 215 (S.D.N.Y.1964).

9. See United States v. Mont, 306 F.2d 412, 414–415 (2d Cir.), cert. denied, 371 U.S. 935, 83 S.Ct. 310, 9 L.Ed.2d 272 (1962); Thomas v. United States, 281 F.2d 132 (8th Cir.), cert. denied, 364 U.S. 904, 81 S.Ct. 239, 5 L.Ed.2d 196 (1960); Williams v. United States, 260 F.2d 125, 128–130 (8th Cir. 1958), cert. denied, 359 U.S. 918, 79 S.Ct. 596, 3 L.Ed.2d 579 (1959); Clifton v. United States, 224 F.2d 329 (4th Cir.), cert. denied, 350 U.S. 894, 76 S.Ct. 152, 100 L.Ed. 786 (1955). Compare United States v. Scott, 149 F. Supp. 837, 840–841 (D.D.C.1957).

10. See United States v. Paroutian, 319 F.2d 661–663 (2d Cir. 1963), cert. denied, 375 U.S. 981, 84 S.Ct. 494, 11 L.Ed.2d 426 (1964). Cf. United States v. D'Angiolillo, 340 F.2d 453, 456 (2d Cir.), cert. denied, 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965).

In addition to the foregoing broad outline of each defendant's respective position, all pressed alleged inconsistencies and contradictions in the testimony of government witnesses and urged the inherent improbability of testimony with respect to various events, and moved upon all the evidence at the close of the case for judgment of acquittal, contending that as a matter of law a reasonable doubt existed. Their motions having been denied, we approach the fact determination.

As the fact finder, the court is under a duty to weigh the evidence, determine the credibility of witnesses and draw whatever reasonable inferences the established facts may warrant.

It is hornbook law that a criminal conspiracy or a defendant's participation in it need not be proved by direct evidence. Both "may be inferred from a 'development and a collocation of circumstances.' "[11]

It is, of course, true that the court must "compartmentaliz[e] the evidence with regard to each particular defendant * * * keeping clearly in mind the full circumstances of each transaction * * * [so] that justice may be meted out to the individual rather than to the group."[12] However, the different acts and statements[13] of each defendant relied upon to establish the charge against him and his knowing participation in the claimed conspiracy are not be be viewed in isolation; they are to be considered in their relation to his other acts and statements, and the totality of his conduct is to be viewed in its relation to the totality of the conduct of each other defendant.[14] Only in this way can a proper determination be made as to whether the claimed conspiracy existed and, if it did, whether a particular defendant was a knowing participant. Thus, a single conversation may be innocent or reflect no illicit purpose, and by itself permit no inference of wrongful conduct; so, too, even a discussion apparently relating to an illicit activity followed by the removal and delivery by one of the conversing participants to the other of a brown paper bag[15] may have no particular significance. But when considered with other incidents, some of them clandestine, all related in purpose and subject, and followed by the actual delivery of a substantial quantity of narcotics, each incident not only gains color

---

11. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Accord, United States v. Manton, 107 F.2d 834, 839 (2d Cir. 1939), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940).

12. United States v. Agueci, 310 F.2d 817, 829 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963). Accord, United States v. Kelly, 349 F.2d 720, 757 (2d Cir. 1965); United States v. Marchisio, 344 F.2d 653, 666 (2d Cir. 1965).

13. Descriptive language used by alleged participants in a narcotics conspiracy may give support to other facts from which illicit conduct may reasonably be inferred. See United States v. Bentvena, 319 F.2d 916, 929 (2d Cir.), cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Massiah, 307 F.2d 62, 67–68 n. 4 (2d Cir. 1962), rev'd on other grounds, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); United States v. Williams, 239 F.2d 517, 518 (2d Cir. 1956).

14. See United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333 (1913); United States v. Dardi, 330 F.2d 316, 325 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Monica, 295 F.2d 400, 401–402 (2d Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962); May v. United States, 84 U.S. App.D.C. 233, 175 F.2d 994, 1008, cert. denied, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949); American Tobacco Co. v. United States, 147 F.2d 93, 106–107 (6th Cir. 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

15. "[A] brown paper bag, in my reading of narcotic cases and limited experience with them, seems to be the copyrighted method of transportation for narcotics." United States ex rel. Wilson v. LaVallee, 251 F.Supp. 292, 295 (N.D.N.Y.1966).

from the others,[16] but may permit a reasonable inference they were in furtherance of a conspiratorial objective.

To establish a conspiracy to violate the narcotics law, proof of actual dealings in narcotics is not required. Such a conspiracy may be established by adequate proof of the unlawful agreement, the commission of an overt act in furtherance thereof, and that a defendant knowingly associated himself with the conspiracy;[17] and an additional element is knowledge by an alleged conspirator of the illegal importation of narcotics. This element may be satisfied by evidence of actual knowledge of the origin and source of the narcotics, or by proof of actual or constructive possession which permits the reasonable inferences under section 174 of Title 21 of unlawful importation and knowledge thereof to be drawn.[18] Possession, whether actual or constructive, may be established by circumstantial evidence and the reasonable inferences to be drawn from established facts.[19]

This court, as the trier of the fact, gives strong heed to the admonition that mere suspicious conduct is insufficient to support criminal charges;[20] that association with alleged conspirators or known criminals does not supply the required degree of proof;[21] and that a defendant has a criminal record—in the case of one defendant herein a rather extensive record—or that one even admits his sole income during the period covered by the indictment was derived from various criminal activities, including the sale of narcotics, is no evidence of the specific charge made against a defendant.[22] However, the character and prior record of a defendant who testifies on his own behalf do bear upon and may properly be considered upon the issue of his credibility.[23]

Upon a review of all the evidence and appraisal of the credibility of all witnesses, government and defense, my impressions of them and their demeanor, consideration of my abstract of testimony, and after a careful reading of the

16. See United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962). Cf. United States v. Dardi, 330 F.2d 316, 325 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964).

17. United States v. Agueci, 310 F.2d 817, 828, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); Poliafico v. United States, 237 F.2d 97, 105 (6th Cir. 1956), cert. denied, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957).

18. United States v. Massiah, 307 F.2d 62, 67, 69–71 (2d Cir. 1962), rev'd on other grounds, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Hernandez v. United States, 300 F.2d 114, 120 (9th Cir. 1962). Cf. Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); United States v. Bufalino, 285 F.2d 408, 416 (2d Cir. 1960).

19. United States v. Agueci, 310 F.2d 817, 828, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963).

20. Glover v. United States, 306 F.2d 594, 595 (10th Cir. 1962); United States v. Nardiello, 303 F.2d 876, 879 (3d Cir. 1962); Evans v. United States, 257 F.

2d 121, 126 (9th Cir.), cert. denied, 358 U.S. 866, 79 S.Ct. 98, 3 L.Ed.2d 99 (1958).

21. See United States v. Di Re, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Glover v. United States, 306 F. 2d 594, 595 (10th Cir. 1962); United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.), cert. denied sub nom. Lessa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); Evans v. United States, 257 F.2d 121, 126 (9th Cir.), cert. denied, 358 U.S. 866, 79 S.Ct. 98, 3 L.Ed.2d 99 (1958); Panci v. United States, 256 F.2d 308, 312 (5th Cir. 1958). Cf. United States v. Euphemia, 261 F. 2d 441 (2d Cir. 1958).

22. See Boyd v. United States, 142 U.S. 450, 458, 12 S.Ct. 292, 35 L.Ed. 1077 (1892); United States v. Harris, 331 F.2d 185, 187 (4th Cir. 1964); Helton v. United States, 221 F.2d 338, 342 (5th Cir. 1955); Sang Soon Sur v. United States, 167 F.2d 431 (9th Cir. 1948); United States v. Dressler, 112 F.2d 972, 981 (7th Cir. 1940).

23. See United States v. Ramsey, 315 F. 2d 199 (2d Cir.), cert. denied, 375 U.S. 883, 84 S.Ct. 153, 11 L.Ed.2d 113 (1963); United States v. Minkoff, 137 F.2d 402, 405 (2d Cir. 1943).

**934**

full transcript of the testimony, I make the following Findings of Fact as specifically enumerated hereafter:

1. That the government witnesses in substance testified truthfully and accurately as to the essential events described in their testimony, and the testimony of each is credible.

2. That the government has sustained by the required degree of proof that a conspiracy existed as charged in counts 2 and 3 of the indictment.

*As to defendant Beigel*

3. That the defendant Beigel willfully, knowingly and intentionally was a member of, and a participant in the conspiracies charged.

4. Government exhibit 14, the heroin, the subject of count 1, was contained in the paper bag placed in the Rambler car on or about 12:10 a. m., March 22, and was thereafter knowingly, willfully and intentionally [24] transported by the defendant Beigel from 58th Street near Sutton Place, Manhattan, within the Southern District of New York, to 37–41 79th Street, Queens; that this act facilitated the transportation and concealment of the narcotics and was in furtherance of the conspiracies; that thereby the said defendant also committed the substantive offense charged in count 1.

5. That the said defendant Beigel had actual physical possession and control of the narcotics above described over an extended period during the time he drove the Rambler from the aforesaid place in Manhattan to Queens; that he has failed to explain his possession of the narcotics; that the inference is warranted and is drawn that the said heroin was illegally imported into the United States, and that Beigel knew of such illegal importation.[25]

6. All essential elements of the offenses charged against the defendant Beigel in counts 1, 2 and 3 have been established beyond a reasonable doubt, and

accordingly the defendant is hereby found guilty of each charge.

*As to defendant Verzino*

Verzino admitted he conducted and discussed some of his illicit activities at various bars, restaurants and lounges, including those where government witnesses testified they overheard conversations, but denied he ever spoke in public about narcotics dealings in the English language. After observing him upon the witness stand, his demeanor, considering his admission that he drank much, the admonition by Soviero, "Watch it, big mouth," which the court finds was part of a conversation between them, it does not strain credulity to accept the testimony of the government witnesses as to the overheard conversations at public places.

7. The defendant Verzino willfully, knowingly and intentionally associated himself with and was a member of the conspiracies described in counts 2 and 3; together with Soviero and Beigel he was at the center of the conspiracies.

8. The defendant Verzino participated in the various discussions attributed to him and engaged in the acts described by the government witnesses.

It is true that Verzino's statements as to prices, deliveries or delay of deliveries could refer to his other illicit activities, or even to licit matters, but taken in context and in their setting, the reference to "stuff" and his discussion with John Doe on February 5 of a substantial sum of money, the appearance of Soviero immediately thereafter, the latter's reference to the location of "it" behind the ashtray, Doe's response that he would see them with the money the next day, followed by Doe's immediate departure and driving away in the old Dodge; the further talk later that evening as to a charge of $7500, and Verzino's answer to Soviero's inquiry that Al had mixed the "stuff" three to one and that it was dynamite, and again Verzino's own action on

24. Compare United States v. Gregory, 309 F.2d 536, 537 (2d Cir. 1962), cert. denied sub nom. Sumpter v. United States, 373 U.S. 953, 83 S.Ct. 1684, 10 L.Ed.2d 707 (1963); United States v. Rheams, 257 F.2d 842, 843 (2d Cir. 1958).

25. 21 U.S.C. § 174.

February 21, when after a conversation with, and in the presence of, Soviero and Beigel he removed a package from the trunk of a car and delivered it to Doe, to mention but a few items, abundantly support the inference that Verzino was an active and knowing participant in the conspiracy.[26] The discussions were not innocent, but purposeful, in furtherance of the conspiratorial objective and intended to effect the sale, concealment, or to facilitate the transportation of narcotics.

9. While Verzino did not have physical custody of the heroin referred to in count 1 (exhibit 14), he was in constructive possession. Verzino fixed prices for narcotics,[27] arranged for, and cooperated in arranging for, the receipt, sales and deliveries of the drugs, and had a working relationship with Beigel which enabled him to assure delivery of narcotics.[28]

■ 10. Defendant having been found in constructive possession of the heroin, has failed to explain such possession, and the inference is warranted and is drawn that the heroin was illegally imported and brought into the United States and that he knew of such illegal importation.

11. The court having found that the transportation of the heroin referred to in count 1 by Beigel from Manhattan to Queens was an overt act in furtherance of the conspiracies in counts 2 and 3, of which Verzino was a member at the time, he is also guilty of the substantive offense set forth in count 1.[29]

12. All essential elements of the offenses charged against defendant Verzino in counts 1, 2 and 3 have been established beyond a reasonable doubt, and accordingly he is hereby found guilty of each charge.

*As to defendant Lapi*

■ As already noted, the preliminary essential issue as to the defendant Lapi is one of identification. The court is satisfied that on this issue the government has sustained its burden of proof. The three witnesses who made identification of him, one of whom had seen him previously at the Cheer Club and elsewhere, had ample opportunity for full observation, and their testimony on identification is credible and accepted.

13. The defendant Lapi willfully, knowingly and intentionally associated himself with and was a member of the conspiracies described in counts 2 and 3.

14. It was Lapi who, on the evening of March 21, 1963, drove the Rambler from York Avenue between 60th Street and 61st Street by a devious route to 58th Street off Sutton Place.

15. It was he who later that evening, March 22, at or about 12:10 a. m., conversed with the driver of the blue Buick car, bearing New Jersey license plate number HDD853, entered the car and soon thereafter, when it was double parked on East 58th Street, west of Sutton Place, received from the driver the brown paper bag, about 15″ x 15″, knowing the contents were narcotic drugs, which he then carried to and placed into the Rambler.

26. Cf. United States v. Green, 327 F.2d 715 (7th Cir.), cert. denied, 377 U.S. 944, 84 S.Ct. 1350, 12 L.Ed.2d 306 (1964); United States v. Wright, 309 F.2d 735 (7th Cir. 1962), cert. denied 372 U.S. 929, 83 S.Ct. 873, 9 L.Ed.2d 733 (1963); United States v. Williams, 239 F.2d 517 (2d Cir. 1956); Cochran v. United States, 212 F.2d 511 (5th Cir. 1954).

27. Compare United States v. Buonanno, 290 F.2d 585 (2d Cir. 1961).

28. See United States v. Jones, 308 F.2d 26, 31 (2d Cir. 1962); United States v.

Hernandez, 290 F.2d 86, 90 (2d Cir. 1961).

29. See Pinkerton v. United States, 328 U.S. 640, 645–647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Accord, Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Castellana, 349 F.2d 264, 277–278 (2d Cir. 1965), cert. denied, 383 U.S. 928, 86 S.Ct. 935, 15 L.Ed.2d 847 (1966).

16. That the bag or package so transported by Lapi from one car to the other is government exhibit 14,[30] which subsequently was transported by the defendant Beigel to Queens; that the defendant Lapi's acts and conduct that evening were knowingly committed and engaged in in furtherance of the conspiracies.

17. The defendant Lapi was in actual physical possession of the narcotics,[31] government exhibit 14, from the time he received it from the driver of the Buick car to its delivery and placement by him in the Rambler car.

18. Defendant Lapi has not explained his possession of the narcotic drugs referred to above, and the inference is warranted and drawn they were illegally imported and that he knew of such illegal importation.

19. All the essential elements of the offenses charged against the defendant Lapi in counts 1, 2 and 3 have been established beyond a reasonable doubt, and accordingly he is hereby found guilty of each charge.

*As to defendant Cutillo*

 The preliminary essential issue in the instance of this defendant also is one of identification.

Of four government witnesses who had the opportunity to observe Cutillo, only one has identified him as the driver of the blue Buick car who drove it to 58th Street and Sutton Place, where the delivery of the narcotics was made from the Buick to the Rambler. The other witnesses were unable to identify him.

The circumstances under which identification of this defendant was made subsequent to the events in question is not without significance. The car was registered in the name of the defendant's brother, Carmen. Investigation by the authorities revealed that Carmen had a brother, Anthony, this defendant, and accordingly his police photograph was obtained, from which the sole government witness who swore Anthony Cutillo was the driver of the Buick identified him as such. This picture identification took place two months after the events of March 21–22, 1963.

Also of significance is that a description of the driver of the car, set forth in an official report made three days after the events on the night in question, is at substantial variance with the characteristics of the defendant as to weight, age and height. And finally, the defendant and his brother, the registered owner, bear a strong resemblance to one another —a fact conceded by the identifying witness who nonetheless asserted he was certain of his identification, basing it in part on the circumstance that after the transfer of the narcotics from the Buick to the Rambler, he rode in a car alongside the moving Buick and observed the driver over a distance of two blocks until surveillance was discontinued. However, a fellow officer seated beside this witness failed to make any identification. The only occasion the identifying witness saw Cutillo was on the night in question; at no time did he have more than a profile view of Cutillo; he had never seen him before or since, until he pointed him out in the courtroom. A sufficient doubt exists on the issue of identity.

20. The government has failed to sustain its burden of proof as to the defendant Cutillo, and accordingly he is acquitted on counts 1, 2 and 3.

30. Compare Galvan v. United States, 318 F.2d 711 (9th Cir. 1963); United States v. Gregory, 309 F.2d 536 (2d Cir. 1962), cert. denied sub nom. Sumpter v. United States, 373 U.S. 953, 83 S.Ct. 1684, 10 L.Ed.2d 707 (1963); United States v. Monica, 295 F.2d 400 (2d Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962); United States v. Pinna, 229 F.2d 216 (7th Cir. 1956).

31. See United States v. Gregory, 309 F. 2d 536–538 (2d Cir. 1962), cert. denied sub nom. Sumpter v. United States, 373 U.S. 953, 83 S.Ct. 1684, 10 L.Ed.2d 707 (1963).