William EVANS and Josephine Evans, Appellants,

v.

UNITED STATES of America, Appellee.

No. 15302.

United States Court of Appeals Ninth Circuit.

May 28, 1958.

Rehearing Denied Aug. 4, 1958.

Certiorari Denied Oct. 20, 1958.

See 79 S.Ct. 98.

Arthur D. Klang, San Francisco, Cal., Lloyd H. Burke, U. S. Atty., John Lockley, John H. Riordan, Robert Schnacke, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before LEMMON, BARNES, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

Waiving a jury, William Evans and Josephine Evans went to trial on a four-count indictment charging violations of the narcotics laws. William, convicted under all four counts, was sentenced to imprisonment for terms aggregating fifty years, and was fined a total of $11,000. Josephine, convicted under counts 1, 2, and 4, was sentenced to imprisonment for five years on each such count, the terms to run concurrently. Both defendants appeal.

Count 1 charged both defendants with unlawful concealment and transportation of two ounces of heroin at San Francisco, on March 4, 1957. Count 2 charged each of them with the unlawful sale of this heroin on the same date. Count 3 charged each of them with unlawfully concealing and facilitating the concealment and transportation of twenty-two grains of marihuana on the same date. The final count charged each of them with conspiring together with the object of unlawfully selling, dispensing, and distributing heroin, and of unlawfully concealing and facilitating the concealment of such heroin.[1]

Concerning the counts relating to heroin—counts 1, 2, and 4—appellants' principal contention relates to the sufficiency of the evidence. Josephine concedes that the evidence is sufficient to sustain her conviction under the substantive heroin counts—counts 1 and 2. She urges, however, that the evidence is insufficient to support her conviction under the conspiracy heroin count—count 4. William argues that the evidence is insufficient to support his conviction under any of the heroin counts.

There is no evidence that William ever had physical possession of the heroin in question. Even so, his conviction under the substantive counts may stand if the evidence sustains the verdict against him on the conspiracy count. Accordingly, we proceed at once to a determination of the adequacy of the evidence to support the conviction of both appellants under count 4.

■ For the most part, the evidence is not in dispute, but where any conflict is found to exist, we accept that version which tends to support the judgments.

Appellants have lived together, "off and on," since 1950 or 1951, although the record does not show whether they were ever married. In the late winter of 1957, they operated an eating place, known as Oliver's Restaurant, at 1569 Ellis street, in San Francisco. William lived above the restaurant, but spent some of his nights at 953 Broderick street, San Francisco.[2] Josephine lived at 181 Thrift street, San Francisco.

The first episode of the sequence of events here in question occurred early on the morning of February 27, 1957. At about 1:30 a. m. that day, while William was at the restaurant, he received a telephone call from one Sine Gilmore.[3]

Gilmore was a user of narcotics, and had twice been convicted of violating the

---

1. In the indictment, it is charged that, pursuant to this conspiracy, four overt acts were committed, as follows: (1) On March 1, 1957, Josephine received the sum of $700 from Sine Gilmore on the premises located at 1567 Ellis Street, San Francisco; (2) on the same date, William had a conversation with Gilmore in the vicinity of 1540 Ellis Street; (3) on March 2, 1957, William had a conversation with Gilmore in a 1949 two-door Buick sedan on Ellis Street between Fillmore and Broderick Streets; and (4)

on March 4, 1957, Josephine had a conversation with Gilmore on Pierce Street between Oak and Page Streets, in San Francisco.

2. Further reference will be made to this address in discussing the marihuana count.

3. With indicated exceptions, the facts hereinafter set out accord with the résumé of the evidence contained in the Government brief.

narcotics laws of California. He had met appellants for the first time, but not together, about six weeks or two months previous to this telephone call. Within a few days prior to that call, Gilmore had received narcotics from one or the other of the appellants.[4] This had occurred on two or three occasions, after Gilmore had given money to Josephine for such purchases. Gilmore had also conversed with William prior to making these purchases, but denied that these conversations occurred when he was buying narcotics from Josephine.

Gilmore made the telephone call of February 27, 1957, from the office of the Federal Bureau of Narcotics. In so doing, and in the transactions of the succeeding few days, he was acting as an informer for, and special employee of, the Bureau. His telephone call on February 27 was monitored by an agent who listened in on an extension.

According to the testimony of this agent, Gilmore told William on this occasion, "My man from Stockton is in town again, and he wants another one just like it. I have the money with me now. Can I come to see you?" William replied that he was busy, and that Gilmore would have to see "the boss" tomorrow.

Gilmore's version of the conversation was "something about somebody coming from Stockton; that wanted something, some stuff, and I think he told me I would have to see the boss." Gilmore understood "stuff" to mean narcotics, and the "boss" to refer to Josephine.[5]

The second episode occurred at approximately 1:00 p. m., on February 27, 1957. At that time, Gilmore met William at Oliver's Restaurant and had a conversation with him. No money or narcotics passed between them at this time.[6]

The third episode occurred on the afternoon of March 1, 1957. Gilmore was supplied with $350 in government funds, and, upon being searched, was found to have $350 of his own money, making a total of $700. He was also equipped with a Schmidt transmitting device. Under surveillance of federal narcotics agents, he proceeded to Oliver's Restaurant, where he remained from 3:30 to 4:30 p. m.

During this period, he was out of the sight of narcotics agents during an interval of only three or four minutes, when he went to the rear of the restaurant. He later reappeared with Josephine, after which he had a conversation with her. Upon rejoining the narcotics agents, he was searched and the $700 was missing. Gilmore testified that he gave this money to Josephine for narcotics he had previously received on consignment.[7]

4. This statement in the Government brief is apparently based on Gilmore's answer, "I suppose so," when asked if he had ever received narcotics "from either Josephine Evans or William Evans." He later denied that he had received narcotics from William at any time. It was his further testimony that he "might have on occasion" discussed narcotics with William, but "not along in that time."

5. Gilmore's actual testimony concerning what was meant by "the boss" is as follows:
   "Q. * * * When he said, 'You will have to see the boss,' who is the boss he was referring to, if you know? A. Well, I guess he was talking about her. Q. Who is 'her'? * * * A. I guess he was talking about Josephine."

6. It may be useful to amplify this description of the episode which occurred on the afternoon of February 27, 1957, as set out in the Government brief. Before Gilmore met William on this occasion, federal agents searched Gilmore, searched his vehicle, and supplied him with $350. They also followed him to the restaurant, where Gilmore entered and stayed nearly an hour. A federal agent entered the restaurant before Gilmore did and remained until after Gilmore left. The agent saw Evans and Gilmore having a five to ten-minute conversation at the end of the counter as Evans was having coffee. The $350 was later returned by Gilmore to the agent.

7. There is no contrary evidence in the record concerning disposition of this money.

The fourth episode occurred in the early evening of the same day. About 7:00 p. m., Gilmore was again equipped with a Schmidt transmitting device. Again he drove to the vicinity of Oliver's Restaurant, under the surveillance of narcotics agents. A panel truck containing the receiving device for the Schmidt transmitter and a narcotics agent had been parked directly across the street from the restaurant since 2:00 p. m.

Shortly after Gilmore parked his car near the cafe, William entered the car, and the two drove to the Chicago Pool Hall. During this drive, William remarked that he was "leery" of the panel truck; that it had been parked there all afternoon.

The fifth episode occurred about midnight on March 1, 1957. At that time, Gilmore returned to the restaurant, went inside for a moment, and then returned to his car with William. As the car was leaving, William was heard to say: "You don't see what's going on around you very well." He added: "There has been heat all around the place tonight. There was heat in the restaurant and in the Booker T. Washington, and we are going to have to let things cool for a few days, and you will have to get in touch with me later."

Gilmore said, "I don't have any money or anything else. What am I going to do?" William replied, "Don't worry about it. I will take care of you." [8]

The fifth episode, described above, is the last involving heroin in which Wil-

liam played a part. A final episode, involving Josephine, occurred on March 4, 1957. At 11:00 a. m., on that day, Gilmore met Josephine by prearrangement at a vacant lot in the vicinity of Page and Pierce streets, San Francisco. Josephine pointed to a board in, the lot, and Gilmore, following her pointed directions, found a package wrapped in newspaper. This package was found to contain two ounces of heroin.

Gilmore testified that he had given Josephine one hundred and some odd dollars of his own money at the restaurant that morning, in part payment for this heroin. He denied giving any money to William for this heroin, or having any conversation with him concerning the money paid over. Gilmore also denied discussing narcotics with William the night before the payment was made, or of receiving any narcotics from him at any prior time. Gilmore stated that he "might have" on occasion discussed narcotics with William, but that "he never have told me he would give me them to sell." Gilmore stated that every time he spoke to William about narcotics, the latter "would refer more or less to the boss." [9]

As before noted, this summary of the evidence is drawn largely from the Government brief. It is evidence which is entirely undisputed, and consists, almost entirely, of the testimony of Government agents. The only non-Government testimony given credence in the above account is that of William (included because it is favorable to the Government), that he

---

8. We briefly amplify this description of the midnight meeting on March 1, 1957, as stated in the Government brief. Gilmore testified that, following the conversation quoted above, he drove William "home" (apparently the Broderick street residence). On the way they had a conversation about playing pool. According to Gilmore, William said "He would help me out."

9. Gilmore also testified as follows:
" * * * Q. Well, he told you that he wouldn't have any dealings in narcotics, isn't that correct? (Testimony of Sine Gilmore.) A. I don't remember what exactly was said over the phone

on that, but if he would say anything, I never could get him to talk about anything that would amount to anything.
"Q. Well, didn't he tell you that he didn't want to make any deal because it was too hot or you might go to jail? A. Well, he told me—no, not like that. He told me, he said, 'I got to think about my kids,' and that he didn't want to do a deal with it because he didn't want to be away from his kids, and that he had been away from them all the time.
"Q. All right. Then he told you that no deal in the world was worth going to the penitentiary for, isn't that right, or words to that effect? A. Words to that effect."

was the recipient of the telephone call of February 27, 1957.

Appellants argue that this evidence is not sufficient to support the judgments of conviction on the conspiracy count. Contending otherwise, the Government states that the clear inference to be drawn from this evidence is that William negotiated with prospective customers for the sale and delivery of narcotics, and arranged with "his co-conspirator," Josephine, to make the actual deliveries.

■ The conspiracy here charged relates to the concealing, selling, dispensing, and distribution of "quantities of narcotic drugs." It was therefore not necessary for the Government to prove that the asserted arrangements between "co-conspirators" involved the two ounces of heroin referred to in counts 1 and 2. However, if it was not shown that the conspiracy involved the particular heroin transaction referred to in counts 1 and 2, proof that William engaged in such a conspiracy would still not warrant his conviction on those substantive counts. Accordingly, we will first consider whether any conspiracy was proved with regard to the two ounces of heroin delivered on March 4, 1957.

The informer, Gilmore, testified that he had no conversation with William, and entered into no arrangement with him, regarding the particular heroin transaction with which we are concerned. There is no evidence to the contrary. The conversations which were heard over the transmitter indicate that William specifically declined to become involved in any transaction. At no time during any of these episodes were the two asserted coconspirators seen together, or shown to have communicated with each other. No one testified that anyone gave William an order for this heroin, or gave him any money for any purpose. There is no evidence to indicate that William ever handled, saw, or knew about the heroin which Josephine delivered to Gilmore.

William's statement to Gilmore in their initial telephone conversation, to see "the boss," would have significance if there was something in the evidence to connect it with the heroin transaction of March 4, 1957. Such evidence is not only lacking, but is specifically disavowed by the Government's witness, Gilmore.

■ There is, of course, evidence of an intimate personal relationship between William and Josephine, who handled the heroin in question. But guilt may not be inferred from mere association. Ong Way Jong v. United States, 9 Cir., 245 F.2d 392, 394.

There is also in the record evidence of William's past narcotics convictions. This evidence was first produced by appellants when William took the witness stand, for the apparent purpose of anticipating the Government's use of such evidence for impeachment purposes. On cross-examination, the Government brought out further references to William's past record. There is no indication that this was done to show scheme, plan, or design, or for any other purpose except impeachment. We have, in our review of the evidence, disregarded all of William's testimony except that which is favorable to the Government.

■■ It is no doubt true that the evidence as to William's association with Josephine, and as to his own past record of convictions, gives rise to a suspicion that he conspired with Josephine regarding the transaction of March 4, 1957. But a suspicion, however strong, is not proof, and will not serve in lieu of proof. Ong Way Jong v. United States, supra, 245 F.2d 394.

■ We therefore hold that the evidence does not support a finding that William or Josephine were involved in any conspiracy involving the two ounces of heroin referred to in counts 1 and 2. Since the conviction of William on those substantive counts is dependent upon a finding that he and Josephine were engaged in a conspiracy involving that transaction, it follows that his conviction on counts 1 and 2 must be set aside.

■ For most of the same reasons, we are led to hold that the evidence does not support a finding that William and

Josephine were engaged in a conspiracy with regard to the concealment, sale, dispensing, or distribution of any other narcotics.

■ The reported conversations between Gilmore and William indicate that there was some talk between the two of them concerning narcotics. But the gist of the conversation was that William declined to become involved in a narcotics conspiracy or transaction. It is true that his apparent reason for remaining aloof was his fear of being caught. It is, however, immaterial that William's refusal to engage in unlawful conduct was actuated by such a motive. In the eyes of the law, a man is innocent if he did not commit the unlawful act, whatever the explanation may be for his good behavior.

The four alleged overt acts were proved, as appellants concede. This is without significance, however, unless these overt acts tend to prove the existence or furtherance of a conspiracy. For the reasons set forth at length above, we believe that the established overt acts serve neither of these functions.

It is our conclusion that the evidence fails to provide a basis for a finding that William and Josephine engaged in a conspiracy with regard to any narcotics. Their convictions on count 4 must therefore be set aside.

William alone was convicted on count 3, relating to the concealment and transportation of twenty-two grains of marihuana. As in the case of the other counts, William contends on appeal that the evidence is not sufficient to support his conviction on count 3.

The evidence pertaining to this count, as set out in the following two paragraphs, follows, almost verbatim, the summary of the testimony contained in the Government brief.

On March 5, 1957, at about 4:10 to 4:20 a. m., William was arrested at 953 Broderick street. This was done pursuant to a warrant of arrest issued by the United States Commissioner for violation of the narcotics laws. A search of the premises was made incident to the arrest. This resulted in the finding of twenty-two grains of marihuana concealed under the carpet on the top step of the stairs inside the dwelling. The marihuana was contained in a coin wrapper or envelope of the same type used to contain the heroin. William had reached the apartment only five minutes prior to his arrest, and when the officers arrived, was attired only in his underwear.

The apartment was also occupied by a woman who then identified herself as Mildred Evans. At that time, she stated that she was married to William, that they lived together, and had their children living there. At the trial, however, she testified that her real name was Mildred Moore. It was her testimony then that she had never used the name Mildred Evans, but that an automobile was purchased in that name. She testified that William did not live with her and the children, one of whom was his, but that he visited her once or twice a week. William testified that he had spent only three or four nights at 953 Broderick street since January 10, 1957.

The record reveals some additional information not referred to in the Government brief. Mildred paid the rent on the Broderick street premises, and was the named customer for gas and electric service. Both William and Mildred testified that he maintained no clothing, toilet articles, or other personal belongings at that address. This was not denied by the federal agents who thoroughly searched the premises.

Mildred denied ownership of the marihuana. When questioned about the marihuana, William asked if the answer would make any difference in obtaining a conviction. Upon being told that it might, he said, "Well, I will try to figure out what you have against me first before I answer that." Later, when told that Mildred was to be booked for joint possession of the marihuana, he said, "Well, you don't want to book her for that." At the trial, William testified that he did not know the marihuana was there

—had not put it there—had never seen it before.

William argues that the above-summarized evidence does not support his conviction under count 3, because it provides no proof that he had the twenty-two grains of marihuana in his possession.

Count 3 is based upon 26 U.S. C.A. § 4744(a), making it unlawful to acquire or otherwise obtain any marihuana without having paid the transfer tax imposed by 26 U.S.C.A. § 4741(a), or to transport, or conceal, or facilitate the transportation or concealment of any marihuana so acquired or obtained. Section 4744(a) further provides that proof that any person shall have had in his possession any marihuana and shall have failed, after reasonable notice and demand, to produce the specified order form, "shall be presumptive evidence of guilt under this subsection * * *."

In presenting its case, the Government relied upon this presumption. It was therefore required to prove that William had the twenty-two grains of marihuana in his possession. He had the narcotics in his possession if he knew of its presence and had control of it.[10] Knowledge and control, and hence possession, may be proved circumstantially. United States v. Pinna, 7 Cir., 229 F.2d 216, 218.

Proof that one had exclusive control and dominion over property on or in which contraband narcotics are found, is a potent circumstance tending to prove knowledge of the presence of such narcotics, and control thereof. People v. Antista, supra.

Where one has exclusive possession of a home or apartment in which narcotics are found, it may be inferred, even in the absence of other incriminating evidence, that such person knew of the presence of the narcotics and had control of them.

The evidence in this record warrants the inference that William lived at 953 Broderick Street part of the time, or was a frequent overnight visitor thereat. He was also present on the occasion when the narcotics were seized, and had arrived there sufficiently in advance of the arresting officers to enable him to hide the narcotics in the place where they were found. But, since he was not in exclusive possession of the premises, it may not be inferred that he knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. See People v. Antista, supra.

In our view, there are such additional incriminating statements and circumstances in this case. The evidence warrants a finding that Mildred was the only other adult who was present when the officers entered, and the only other adult who had access to the interior of the residence. She denied knowledge of the presence of the narcotics or ownership of them. William, when questioned after arrest, did not remain silent as he had the right to do,[11] but made a statement (quoted above) tending to substantiate Mildred's disclaimer.

The factfinder was entitled to accept her disclaimer, the result of which is to leave William as the only other person who could have placed the narcotics where they were found. He denied knowledge of the presence of the narcotics, or ownership of them. The factfinder, however, was not required to believe him, especially in view of his previous narcotics convictions.

In view of these circumstances, and in the light of all the testimony summarized above, we are of the opinion that the evidence is adequate to sup-

10. Guevara v. United States, 5 Cir., 242 F.2d 745, 746; People v. Antista, 129 Cal. App.2d 47, 276 P.2d 177.

11. See Ong Way Jong v. United States, 9 Cir., 245 F.2d 392; Sandez v. United States, 9 Cir., 239 F.2d 239; 1957 Ann. Survey Am.L., N.Y.Univ.Law Rev., March 1958, vol. 33, No. 3, page 338.

port the conviction of William on count 3 of the indictment. Conviction on this count is not here challenged on any other ground.

Reversed as to William Evans on counts 1, 2, and 4, and as to Josephine Evans on count 4. In all other respects, the judgment is affirmed.

The death of Circuit Judge LEMMON occurred on April 26, 1958. Although he heard the oral arguments, he did not participate in the foregoing decision.