**UNITED STATES of America,
Appellee,**

v.

**Alphonse SISCA et al., Appellants.**

**Nos. 445, 448, 458, 474, 476, 486, Dockets 73–2017, 73–2045, 73–2178, 73–2179, 73–2181 and 73–2185.**

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1973.

Decided May 10, 1974.

Certiorari Denied Nov. 11, 1974.

**1338**

Gino Gallina, New York City (Lenefsky Gallina Mass Berne & Hoffman, New York City, on the brief), for appellant Sisca.

Henry J. Boitel, New York City (Lenefsky Gallina Mass Berne & Hoffman, New York City, on the brief), for appellants Abraham, Grant and Logan.

Robert H. Kiernan, New York City (Lenefsky Gallina Mass Berne & Hoffman, New York City, on the brief), for appellant Hoke.

John L. Pollok, New York City, for appellant Holder.

Edward Gasthalter, New York City, for appellant Brown.

Robert P. Leighton, New York City, for appellant Ellington.

Gilbert Epstein, New York City, for appellant McBride.

W. Cullen MacDonald, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., and John D. Gordan III, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before MOORE, HAYS and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Alphonse Sisca, Willie Abraham, Walter Grant, Margaret Logan, Robert Hoke, Erroll Holder, William Brown, Leonard Ellington and Lavern McBride [1] appeal from judgments of conviction entered upon jury verdicts returned in the Southern District of New York on February 23, 1973 after a six week trial before Frederick van Pelt Bryan, *District Judge,* finding them guilty of conspiring to distribute hard narcotics in violation of 21 U.S.C. § 846 (1970) (Count One); finding all except Sisca and Hoke guilty of using communication facilities in furtherance of the conspiracy in violation of 21 U.S.C. § 843(b) (1970) (Count Three); and finding Abraham guilty of engaging in a continuing criminal enterprise involving hard narcotics in violation of 21 U.S.C. § 848 (1970) (Count Two).

Of the numerous claims of error raised on appeal, we find the following

to be the principal ones: (1) McBride, Hoke, Ellington, Brown and Sisca challenge the sufficiency of the evidence as to them; (2) Grant, Logan, Hoke, Holder and Abraham claim that there was a material variance between the single conspiracy charged and the multiple conspiracies said to have been proven; (3) Abraham challenges the constitutionality of the continuing criminal enterprise statute on its face and as applied to him; and (4) all appellants claim that the government's failure adequately to minimize its electronic surveillance requires total suppression of the wiretap evidence and its fruits, and they further claim that their deliberate refusal to move to suppress on that ground prior to trial did not constitute a waiver of their constitutional right to do so thereafter. Other subordinate claims of error also are raised.

We affirm.

## I. FACTS

### (A) *Overall Enterprise*

The evidence, derived largely from wiretaps and their fruits, established that appellants and others were wholesale and major retail operatives in a large scale, vertically integrated heroin and cocaine[2] distribution network embracing Westchester County, New York City and New Jersey. Sisca and one Benjamin Castalozzo were the top links

---

[1]. In addition to the nine appellants whose appeals are before us, the indictment named nine other defendants. Of these, motions for judgments of acquittal were granted as to Theodore Johnson, Gerald Hartley, Milton Basemore and Cassandra Sullivan; Benjamin Castalozzo, Parris Sizemore and Herbert Owens were fugitives at the time of trial; the case against Cleo Dingle was severed prior to trial; and Carol Holder, who was convicted on Count One, apparently has not appealed from her sentence of 5 years probation.

Abraham was sentenced to 15 and 4 year consecutive terms on Counts One and Three, and to a concurrent life term on Count Two. Grant and Holder were sentenced to 15 and 4 year consecutive terms on Counts One and Three. Brown was sentenced to 15 and 4 year concurrent terms on Counts One and

Three. Ellington was sentenced to 8 and 4 year concurrent terms on Counts One and Three. Hoke and Sisca were sentenced to 15 year terms on Count One. Logan was sentenced to 5 and 3 year concurrent terms on Counts One and Three. McBride was sentenced to 5 and 4 year concurrent terms on Counts One and Three. All appellants were sentenced to special parole terms following their release from prison.

All appellants have been enlarged on bail pending appeal, except Grant who is in state custody and Abraham as to whom bail was denied.

[2]. The indictment refers to Schedule I and II controlled substances. 21 U.S.C. § 812 (1970). The evidence established that for the most part heroin was involved, and to a lesser extent cocaine.

between unknown sources and this $5,000,000 a year corporate-like criminal enterprise which distributed 200 kilograms of heroin annually. Its day to day operations were directed by Abraham. He controlled the wholesale distribution activities of Hoke, Logan, Grant, Brown, Ellington and Holder, among others. Further down the marketing chain and somewhat closer to the retail level, Holder[3] was the proprietor of a heroin cutting and packing "mill" where he and his wife, Carol, employed five "mill girls" who adulterated and repackaged the heroin for delivery by Ellington to their customers, one of whom was McBride.

### (B) Electronic Surveillance

In view of the district court's clear and detailed statement of the facts with respect to the electronic surveillance here involved during the period from September 28 to December 15, 1971, 361 F.Supp. 735, it is sufficient for our purpose merely to summarize briefly those facts necessary to an understanding of our rulings on this issue.

On September 27, the Westchester County District Attorney's Office applied to Judge Timothy Sullivan of the Westchester County Court for an order authorizing a tap of the telephone listed in the name of Carol Holder and located at the Holder residence in Yonkers (the Holder tap). The order was issued the same day. It included, as did the others here involved, a clearly adequate "minimization" provision.[4]

The tap was installed on September 28 and continued, pursuant to a court ordered extension, through November 24. The interception terminus (plant) was equipped to record both in-coming and out-going calls and to register the telephone numbers of calls made from the Holder phone. Investigators from the Westchester County Sheriff's office attended the plant twelve to sixteen hours a day. Nevertheless, the recording and registering devices at all times were maintained on an automatic setting and were activated each time the telephone receiver was lifted from its cradle. As a result, each call made to or from the Holder phone during the interception period was recorded or overheard, or both. Logs and transcripts of all calls were made.

Relying primarily on information gathered from the Holder tap, the Bronx County District Attorney's office on November 8 applied for and obtained from Justice William Kappelman of the Bronx County Supreme Court an order authorizing a tap of the telephone listed in the name of Margaret Logan and located at the Co-Op City Apartment (the Logan tap). This tap was directed principally at uncovering the narcotics related activities of Logan's boyfriend, Abraham. The tap was maintained until December 15, the date of Logan's arrest.

Except for the around the clock monitoring, the Logan tap was conducted in a manner essentially the same as the Holder tap. Each call was automatically recorded and a log was prepared for each reel of tape.

Also on November 8, Justice Kappelman authorized a tap of the telephone listed in the name of Lavern McBride (the McBride tap). As with the Logan tap, the McBride tap was attended 24 hours a day. With one exception, all calls were monitored, recorded, logged and in some cases summarized.

### (C) The Conspiracy

Evidence derived from the three court authorized wiretaps, coupled with visual surveillance, disclosed a vast chain-type narcotics distribution conspiracy. The

---

3. Unless otherwise indicated, reference in this opinion is to appellant Erroll Holder. When we refer to his wife, Carol, we shall so state.

4. N.Y. Criminal Procedure Law § 700.30(7) (McKinney 1971) requires that an eaves-

dropping warrant contain a provision to assure that the interception

"be conducted in such a way as to minimize the interception of communications not otherwise subject to eavesdropping . . . . ."

following summary reflects no more than the tip of the iceberg.

Shortly after the Holder tap was installed on September 28, Holder was overheard discussing a ransom of $14,000 and "you know—something else", that "thing", "junk merchandise", which had been paid for the return of his kidnapped partner, one Theodore Johnson. Holder also was overheard arranging for precautions to be taken by his "women" in the event they were threatened with kidnapping. The "women" later were identified as Holder's wife, Carol, and the five "mill girls" who operated the narcotics cutting and packaging facility.

At periodic intervals beginning in early October, the Holders were overheard planning a rendezvous with their mill girls. After several unsuccessful attempts, surveillance teams on November 24 finally managed to follow Carol Holder and the five mill girls to their meeting place on Convent Avenue in Manhattan. Armed with a search warrant, the agents raided the apartment in the early morning hours of November 24. They uncovered a narcotics mill in full operation. They found Carol Holder and the girls literally in the midst of packing thousands upon thousands of heroin filled glassine envelopes for retail street sale.[5]

This raid put a serious crimp in the overall Holder operation. Within two days, McBride was overheard telling a would-be narcotics purchaser that the Holder cupboard was bare. She said, "If Fox (Holder) is out—everybody's out."

Conversations intercepted on the Holder tap in early November also disclosed the relationship between Abraham, Holder and the latter's courier, Ellington, in the hierarchy for the distribution of heroin. On November 8, at 2:35 P.M., for example, Abraham called Holder and said that he had good news,

"Tonight". Ten minutes later and again that evening, Holder called Ellington and directed him to be prepared for a night-time delivery. At 9:43 P.M. the same evening, Abraham called Holder again and said that, although "they didn't give me as many as they were supposed to", Holder ought to send "that boy over". Holder immediately called Ellington and ordered him to "go downtown with it, you know what I'm talking about."

While most of Holder's conversations were guarded and obtuse, their import was clear to those engaged in the business. On one occasion a disgruntled customer called Holder and complained that he had received only four rather than the promised ten ounces on his last narcotics purchase: "Listen Fox. That was four (4) on the scale and four (4) by spoon count. Anyway you weigh it . . . Ya hear me." Holder agreed to "make up the difference" or "give . . . back the scratch".

Interceptions on the Logan tap also indicated Abraham's role as the director of the other appellants. Logan, Abraham's surrogate, frequently was overheard taking messages and orders and planning to attend meetings in Abraham's absence. Grant was at Abraham's beck and call. On one occasion Grant was told by Abraham where and when to meet one who wanted "to buy you know". At other times Grant appeared at Logan's apartment as directed by Abraham. Brown's role as an outlet for Abraham's merchandise also was clearly indicated.

The Logan tap further revealed the roles of Sisca and Castalozzo as the suppliers of narcotics to Abraham. Both were overheard at various times arranging meetings with Abraham or, in his absence, with Logan. On December 13, surveillance agents for the first time were able to follow Abraham to the meeting place and to observe him in his car conversing with Sisca at the ap-

---

5. Later the same day, the Holder residence (to be distinguished from the Convent Avenue apartment) was searched pursuant to a warrant. A large amount of cash was found hidden in a raised sleeping platform in the bedroom.

pointed hour. Shortly after the meeting began, Castalozzo, who had been serving as a look-out, apparently noticed the surveillance. Immediately upon his warning, "This car is dirty . . . Come on", Sisca got out of Abraham's car. He and Castalozzo got into another nearby car and, after driving slowly for several blocks, sped away from the pursuing officers in a "French Connection"-like flight between the pillars of an elevated subway.

Beginning with this abortive December 13 meeting between Sisca and Abraham, there was frenetic activity on the part of the co-conspirators as the police investigation approached a culmination. Such activity included a call from the agitated Castalozzo to Logan to arrange another rendezvous with Abraham, a December 14 call from Abraham to Brown directing the latter to be prepared for a delivery the next morning and a noontime meeting between Grant, Logan and Hoke on December 14.

On the following morning, December 15, Abraham, Logan, Grant and others were observed at various times entering the Hoke residence on Olmstead Avenue in the Bronx. Grant entered carrying a collapsed valise. Abraham and Logan each had empty shopping bags. After brief stays, Hoke's visitors left with their containers full. Surveillance teams followed the suspects to different locations and arrested them. The containers which each had carried from the Hoke residence were searched and found to contain large amounts of heroin. When Abraham was arrested after a high speed chase, he admitted that over a period of two and a half years he had purchased bi-weekly and redistributed approximately 200 kilograms of heroin annually.

Later that day, Hoke was arrested upon leaving his house. A search of his house pursuant to a warrant produced large amounts of heroin, cash, narcotics packaging paraphernalia, a rifle and several revolvers.

On the evening of December 15, Grant's home and the apartments of Logan and McBride were searched pursuant to warrants. An immense quantity of narcotic adulterants was found in Grant's basement. A complete narcotics cutting mill, quantities of both heroin and cocaine, and a revolver were found in McBride's apartment. While examining a sleeping platform in Logan's apartment, an officer raised a loose section of the platform's carpeting and discovered what appeared to be the organization's current accounting record.[6]

## II. SUFFICIENCY OF THE EVIDENCE

McBride, Hoke, Ellington, Brown and Sisca claim that the evidence was insufficient to support the jury's verdicts. Viewing the evidence in the light most favorable to the government, United States v. McCarthy, 473 F.2d 300, 302 (2 Cir. 1972), we hold that each of these claims is without merit.

### (A) McBride

■ A search of McBride's apartment on the evening of December 15 uncovered a complete narcotics cutting mill. Her participation in the conspiracy was clearly established in an intercepted call shortly after November 24 when she identified the "Fox" (Holder) as her narcotics supplier and stated, "If Fox is out—everybody's out."[7]

---

6. This record indicated the following shares:

| | Pay | Balance |
| --- | --- | --- |
| "Walter [Grant] .. | 22,000 | 10,000 | 12,000 |
| Fox [Holder] .... | 5,000 | |
| Bobby [Hoke] ... | 5,000 | |
| Bill [Brown] .... | 13,000 | |
| Sandy ......... | 25,000" | |

The last entry referred to a deceased co-conspirator, Melvin Coombs, and his girlfriend, Cassandra Sullivan.

7. We reject out of hand McBride's contention that there was insufficient non-hearsay evidence to warrant the admission against her of co-conspirators' statements identifying Holder as the "Fox". Her own intercepted admission that she was out of heroin, coupled with her arrest in constructive possession of heroin, clearly supported the court's preliminary determination of her participation in the conspiracy. United

**(B)** *Hoke*

Hoke claims that he was in an inebriated stupor and therefore was completely unaware of what went on at his house on the morning of December 15. In the alternative, he claims that the evidence of his meeting with Logan and Abraham on December 14, coupled with that indicating that his *entire house*[8] was a "stash" for a narcotics distribution enterprise, permits at most an inference of his knowledge of but not his active participation in the conspiracy. We reject both claims.

While evidence of mere attendance at a meeting or knowledge of a conspiratorial act, without more, may not be sufficient to support an inference of active participation in a conspiracy, United States v. Stewart, 451 F.2d 1203 (2 Cir. 1971); United States v. Kearse, 444 F.2d 62 (2 Cir. 1971), here there was far more. The government does not rely on Hoke's mere presence at the premises where contraband was found, as in *Kearse*; nor was his involvement as limited as that of the chauffeur of a drug dealer in *Stewart*. Hoke was the owner, and shared with his wife exclusive possession, of a house found strewn with narcotics and various other paraphernalia of a heroin trafficking operation. This, coupled with his presence on the premises while others entered and left carrying containers of heroin, clearly permitted the inference that Hoke performed the critical role of maintaining the "stash" or "safe haven" for the distribution operation. United States v. Terrell, 474 F.2d 872, 875 (2 Cir. 1973); cf. Evans v. United States, 257 F.2d 121, 128 (9 Cir.), cert. denied, 358 U.S. 866 (1958). Further, the suggestion that members of a conspiracy would entrust $60,000 in cash and a large quantity of narcotics to one who was not a full part-

ner strains credulity. United States v. Terrell, *supra*, 474 F.2d at 875. Finally, when considered in conjunction with other evidence, United States v. Cassino, 467 F.2d 610, 618 n. 21 (2 Cir. 1972), the entry "Bobby 5,000" on the accounting record found at the Logan apartment surely permitted the inference that it referred to Hoke's share of the December 15 delivery.

**(C)** *Ellington*

While there was no evidence that Ellington had narcotics in his possession during the period of the conspiracy, there were eight intercepted telephone conversations on the basis of which the jury was warranted in finding that Ellington had an established role in the Holder-Abraham operation. For example, on that occasion referred to above after Ellington was directed by Holder to "go downtown with it, you know what I'm talking about", Ellington did so. The next day he reported back to Holder that "Purcell . . . gave me a grand" but "he wants something tomorrow morning". Ellington also informed Holder that another individual, Bruce, was "happy to get it last night."

This repeated though guarded use of cryptic expressions by members of· a narcotics conspiracy has been aptly described as a "narcotics code". United States v. Manfredi, 488 F.2d 588, 597 (2 Cir. 1973), cert. denied, 417 U.S. 936 (1974). The use of such expressions in the context of the entire record in the instant case, including the conversations between Holder and Ellington, was sufficient to permit the jury to find that Ellington was an active participant in the conspiracy.

**(D)** *Brown*

There was evidence that on at least three occasions in the fall of 1971

---

States v. Geaney, 417 F.2d 1116, 1119 (2 Cir.), cert. denied, 397 U.S. 1028 (1969).

8. The search of Hoke's house uncovered the following: a quantity of heroin in plain view on the living room floor; an attache case containing $39,000 in the master bedroom

closet; a revolver on the bed; scales and bagging equipment in the kitchen; an attache case containing $20,130 in the living room closet, together with several revolvers and a rifle nearby; and several thousand glassine envelopes in the basement garage.

Brown and Abraham agreed over the telephone to meet and then did meet at the "same place" to transfer drugs and money when they were "ready for" each other.

On one such occasion, on November 16, Brown drove from New Jersey to a deserted street in Manhattan, surreptitiously removed an attache case from the trunk of his car and handed it to Abraham who immediately locked it in the trunk of his car. Two days later, Brown called Abraham and expressed disappointment upon learning that "nothing [was] happening" and that "everything [was] quiet." The jury could well have inferred from this that Brown's disappointment was directed at Abraham's failure to deliver narcotics for which he had been paid two days earlier.

Even more damaging was the evidence that on December 14, within a few hours of the Hoke distribution, Abraham called Brown and advised him that "I'll see you tomorrow at 12." At 11:40 A.M. the next day, Abraham left the Hoke residence with a shopping bag full of heroin. Had it not been for his unexpected arrest, Abraham would have been able to keep his appointment with Brown.

This evidence, together with a great deal more, such as the accounting record showing "Bill 13,000", was more than sufficient to permit the jury to find that Brown was not only a regular customer of Abraham but also the intended recipient of the heroin carried by Abraham at the time of his arrest.

(E) *Sisca*

■ The government adduced evidence that Sisca and Castalozzo were the top echelon links between unknown sources of supply and the narcotics distribution enterprise here involved. The principal evidence of Sisca's participation in the conspiracy were eight intercepted telephone conversations with Abraham, Castalozzo and Logan, and his presence at, and flight from, a furtive, night-time meeting with Abraham on December 13.[9]

During one of these conversations—the last intercepted before the aborted December 13 meeting between Sisca, Castalozzo and Abraham—Sisca was overheard telling Abraham that the "balance" of the "thing" was available for delivery. While such talk in other context would hardly be incriminating on its face, what we have said above regarding the sufficiency of the evidence against Ellington applies with equal force here. The repeated use of such cryptic phrases in conversations with other members of the conspiracy,[10] many of whom were apprehended in possession of narcotics, was sufficient to permit the jury to find that Sisca was an active participant in the conspiracy. United States v. Manfredi, *supra.*

Moreover, it is highly significant that this last intercepted call and the aborted meeting which followed pursuant to the call took place within a day of the Hoke distribution when Abraham received a large quantity of heroin. In this context, the jury was warranted in finding that the "balance" of the "thing" were the eight kilograms of heroin which were seized on the morning of December 15. This is buttressed by Sisca's flight in response to Castalozzo's warning, "This car is dirty." If this remark meant, as might reasonably have been inferred, that the "balance" referred to

9. We reject Sisca's contention that, because he was acquitted on the count charging illegal use of the telephone, we may not properly consider the substance of intercepted telephone conversations in weighing the sufficiency of the evidence against him on the conspiracy count. Cf. United States v. Carbone, 378 F.2d 420 (2 Cir.), cert. denied, 389 U.S. 914 (1967).

Sisca's contentions and offers of proof with respect to electronic and visual identification inadequacies were properly addressed to the jury which rejected them.

10. Other members of the conspiracy regularly used such obtuse but, in the context of this record, narcotics related phrases as "that thing" (Holder), "one" (Abraham), "something" (Brown, Ellington), "it" (Ellington), "the same thing" (Grant, Brown).

narcotics being at the scene, then the jury was entitled to view Sisca's precipitous flight as evidence of consciousness of guilt. United States v. Christophe, 470 F.2d 865, 869–70 (2 Cir. 1972), cert. denied, 411 U.S. 964 (1973).

## III. SINGLE CONSPIRACY

Grant, Logan, Hoke, Holder and Abraham claim that the evidence established four separate conspiracies of the "hub-spoke" type rather than the single "chain" type conspiracy charged in the indictment. This claim is no stranger to this Court. See, e. g., United States v. Vega, 458 F.2d 1234, 1236 (2 Cir. 1972), cert. denied, 410 U.S. 982 (1973); United States v. Borelli, 336 F.2d 376, 382–87 (2 Cir. 1963), cert. denied, 379 U.S. 960 (1965); see also Kotteakos v. United States, 328 U.S. 750, 773–74 (1946). These appellants also claim that the court failed adequately to instruct the jury that it must find a single conspiracy and not multiple conspiracies. We hold that each of these claims is without merit.

■ The evidence was sufficient to permit the jury to find that each appellant played a well defined role in a highly structured, disciplined and vertically integrated criminal enterprise, and that the "part with which [each] was immediately concerned, was dependent upon the success of the whole." United States v. Tramaglino, 197 F.2d 928, 930 (2 Cir.), cert. denied, 344 U.S. 864 (1952), quoting from United States v. Bruno, 105 F.2d 921, 922 (2 Cir.), rev'd on other grounds, 302 U.S. 287 (1939); see also United States v. Bynum, 485 F.2d 490, 495–96 (2 Cir. 1973). Intercepted telephone conversations and visual surveillance clearly established the necessary links between all appellants and their continuous involvement with each other. United States v. Calabro, 449 F.2d 885, 892–93 (2 Cir. 1971), cert. denied, 404 U.S. 1047 (1972). The fact that not each of the conspirators was acquainted with each of the others is of no significance. It is sufficient for the government to have proven, as it did

here, that "each knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business." United States v. Bynum, supra, 485 F.2d at 496; United States v. Calabro, 467 F.2d 973, 982–83 (2 Cir. 1972), cert. denied, 410 U.S. 926 (1973).

We also hold that Judge Bryan's charge on this issue was clearly appropriate—indeed, if anything, more favorable to appellants than that to which they were entitled. He properly marshalled the evidence, explained in detail the essential elements of the crime of conspiracy and made it crystal clear that, before appellants could be convicted, the jury was required to find "the single conspiracy charged."

## IV. CONTINUING CRIMINAL ENTERPRISE

■ Abraham's claim that the continuing criminal enterprise provision of 21 U.S.C. § 848 (1970) on its face is void for vagueness is foreclosed by our decision in United States v. Manfredi, supra, 488 F.2d at 602–03, where the same claim was rejected. We also reject Abraham's claims that the statute is unconstitutional as applied to him or, in the alternative, that the evidence was insufficient to sustain his conviction under that statute.

■ To establish a violation of Section 848, the government was required to prove that Abraham occupied a position as organizer or a managerial or supervisory position with respect to a continuing narcotics trafficking operation in concert with five or more other persons, and that he derived substantial income or resources from the operation. The evidence was more than sufficient to bring Abraham squarely within the statute.

It is beyond dispute that Abraham was the operational kingpin of a highly organized, structured and on-going narcotics distribution network. Electronic and visual surveillance provided impressive documentation of a continuing dis-

tribution relationship between Abraham as a major wholesale supplier and such lower level wholesale and major retail operatives as Logan, Brown, Grant, Hoke, Coombs and Holder and, through the latter, with Carol Holder, Ellington and McBride. Evidence of a similar high degree of trustworthiness established Abraham's responsibility for and direct control over those working under his supervision. In fact, Abraham's own admissions corroborate other evidence of his supervisory position in the organization. After his arrest on December 15, he admitted that he had purchased that morning heroin worth more than $170,000, and that he had been making large purchases and subsequent redistributions on a bi-weekly basis for a period of some two and one half years.[11]

In the teeth of this evidence, Abraham nevertheless contends that the government failed to prove that he had gained substantial economic benefit from his distribution activities. He says that his December 15 purchase was on "consignment" and that he was $170,000 in debt at the time. This contention is fatuous, to put it charitably. In the first place, we reject any notion that a consignment debt necessarily suggests an operational deficit. On the contrary, in the context of this record, it indicates a substantial anticipated profit. Secondly, in view of his position in the distribution network, the enormous quantity of narcotics involved (over 200 kilograms annually) and the substantial sums of money changing hands ($5,000,000 annually), the jury surely was justified in finding that Abraham derived substantial income from this immensely profitable narcotics enterprise.

## V. MINIMIZATION

All appellants claim that the electronic surveillance from which most of the evidence was derived failed to comply with the minimization requirements of state and federal law. N.Y.Criminal Procedure Law § 700.30(7) (McKinney 1971); 18 U.S.C. § 2518(5) (1970). They claim that the appropriate remedy for such a failure is the total suppression of the wiretap interceptions and their fruits. They rely upon United States v. Focarile, 340 F.Supp. 1033 (D. Md.), aff'd on other grounds sub nom. United States v. Giordano, 469 F.2d 522 (4 Cir. 1972), aff'd, 416 U.S. 505 (1974); but see United States v. Cox, 462 F.2d 1293 (8 Cir. 1972).

We decline to rule on the merits of either of these claims.[12] We hold, as did the district court below at trial and after a post-trial hearing, that appellants knowingly and intentionally waived their rights to challenge the admissibility of the wiretap evidence in that they deliberately failed to raise the claim of failure to minimize in a pretrial motion although specifically directed to do so.

The statutory requirement of a *pretrial motion to suppress* wiretap evidence is set forth in 18 U.S.C. § 2518 (10)(a) (1970) which provides in pertinent part:

"Such motion [to suppress the contents of any intercepted wire . . . communication, or evidence derived therefrom] *shall* be made before the trial . . . unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion." (emphasis added)

It is undisputed that no pretrial motion on the ground of failure to minimize

---

11. Assuming arguendo that it was error to have permitted the jury to consider Abraham's admissions with respect to drug transactions that occurred prior to the May 1, 1971 effective date of Section 848, we hold that such error was harmless beyond a reasonable doubt. The proof that Abraham was engaged in bi-weekly narcotics transactions for one and a half years clearly was sufficient to satisfy the "continuing series of violations" requirement of that section.

12. In view of the ground of our decision, we need not decide whether the appropriate *remedy* for inadequate minimization of a state wiretap, as opposed to whether there was adequate minimization, is a question of state or federal law. See United States v. Manfredi, *supra*, 488 F.2d at 598 n. 7.

was made here. This does not end the inquiry. The question remains whether appellants' failure to make such pretrial motion can be justified by either of the statutory exceptions to what otherwise appears to be the absolute time requirement of Section 2518(10)(a). We hold that their failure was not justified.

On November 8, 1972, a few weeks after the return of the indictments and almost two months before the original trial date, the government formally advised appellants that "all tapes of conversations electronically recorded under Court order" would be made available for inspection and copying. Shortly thereafter, the government provided appellants with a voluminous amount of material relating to the interceptions, including the wiretap orders, the supporting papers and a complete log of the Holder tap. Facilities for listening to and copying the interceptions were provided. By late December, appellants' tape evaluation process was well under way.

On December 27, Judge Bryan held a pretrial conference to consider, among other matters, appellants' request for an adjournment of the trial which was then scheduled to begin January 3. The transcript of that conference clearly shows that appellants were well aware of the factual basis for a failure to minimize claim if they had intended as a matter of trial strategy to assert such a claim. In stressing the need for additional time to consider and evaluate the tapes, counsel for Sisca, Abraham, Grant, Logan, Hoke and Holder (this counsel was acting for other appellants as well) made the following statement about the 200 hours of recordings which had already been analyzed:

"We also discovered to our chagrin that the agents and the police who executed the warrants did not follow the directives in the warrants, did not follow the directives of federal law, and that is minimization."

In direct response to this statement, Judge Bryan said: [13]

"Now, if, for example, you have any affirmative evidence which you claim presently justifies the suppression of anything, any of the taped materials, it seems to me quite clear that that ought to be raised forthwith."

Despite this clear directive, appellants chose not to avail themselves of the opportunity provided by the court to move to suppress on the ground of alleged failure to minimize.

On December 29, Judge Bryan held another pretrial conference. This time he agreed to postpone the trial until January 15. He did so because defense counsel desired further time to continue listening to the tapes on the minimization and other questions. No minimization motions were filed during the ensuing two and a half weeks before the trial began.

Indeed, not until January 23, five days after the trial began, when the government sought for the first time to introduce evidence derived from the Logan tap, did defense counsel find it "appropriate" formally to raise the minimization issue. Judge Bryan denied this motion, and similar ones made during trial, on the ground that they were not timely. After trial, the judge held an evidentiary hearing on appellants' minimization claims. He denied the motions to suppress in all respects—"both on the ground that defendants waived their right to make such motions and on the merits." 361 F.Supp. at 748.

We affirm the district court's denial of the motions to suppress, but we do so on the ground that appellants waived their right to challenge the admissibility of the wiretap evidence by deliberately refusing to raise the failure to minimize claim in a pretrial motion. Appellants knew of the alleged failure to minimize at least three weeks prior to trial. Indeed, they themselves brought to the attention of the court the facts upon which such a motion could have

13. By this time, Judge Bryan had ruled upon motions to suppress the wiretap evidence from the Holder, Logan and McBride interceptions. These motions were made on a variety of grounds. No such motion, however, had claimed the failure to minimize.

been made, had their trial strategy called for it. Despite a clear direction from the court, however, they made no pretrial minimization motion. We hold upon this record that appellants' conduct squarely violated the time requirement of Section 2518(10)(a) and was not justified by either of its exceptions.

Appellants argue, however, that, having put the court "on notice" with respect to their minimization claim prior to trial, they cannot be said to have waived an important constitutional right simply by having postponed their formal motions until trial. They assert that the attitude of the judge, in finding a waiver *under these circumstances* "is characteristic of a prosecutorial mentality rather than a judicial mentality." We emphatically disagree.

We recently have emphasized the importance of having suppression motions made and, where possible, determined prior to trial. United States v. Tortorello, 480 F.2d 764, 785 n. 18 (2 Cir. 1973), cert. denied, 414 U.S. 866 (1973); cf. United States v. McCall, 489 F.2d 359, 363 (2 Cir. 1973). Moreover, Congress intended strict adherence to this policy with respect to motions pursuant to Section 2518(10)(a). The Report of the Senate Judiciary Committee [14] on Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. (1970), of which Section 2518(10)(a) is a part, made it clear that this provision was intended to limit the evidentiary sanction of exclusion provided in Section 2515:

> "[Section 2518(10)(a)] must be read in connection with sections 2515 and 2517, . . . which it *limits*

. . . . The motion *must* be made before the trial, hearing, or proceeding unless there is no opportunity to make the motion or the person was not aware of the grounds of the motion . . . . Care must be exercised to avoid having a defendant defeat [the government's] right of appeal . . . , by waiting until trial." (emphasis added)

 Appellants argue, however, that Congress was mistaken and that an intentional and unjustifiable failure to make a timely suppression motion does not jeopardize the government's right to appeal pursuant to Section 2518(10)(b). Constitutional issues aside, see United States v. Birrell, 470 F.2d 113, 115 n. 2 (2 Cir. 1972), Congress clearly intended to permit the government to appeal only from an *adverse* ruling on a *properly* made suppression motion. Here, appellants' motions to suppress were improperly made because they were untimely. We reject appellants' suggestion that Congress intended the incongruous result of an appeal from a ruling on a suppression motion which, as here, would have been time barred by Section 2518(10)(a).

Moreover, the potential loss of its right to appeal is not the only prejudice suffered by the government when a suppression motion is inexcusably delayed until trial. An adverse ruling on a pretrial motion will permit the government to change the theory of its case, to develop or place greater reliance upon untainted evidence or otherwise to modify its trial strategy. When the deliberate trial strategy of defense counsel is to obtain such a ruling only during or after trial, this flexibility obviously is lost.[15]

---

14. S.Rep.No.1097, 90th Cong., 2d Sess. (1968), quoted in 2 U.S.Code Cong. & Adm. News 2195 (1968).

15. Appellants contend that the government could not possibly have been prejudiced here because its entire case was derived from wiretap evidence and its fruits. Such reasoning is unpersuasive for several reasons. First, it is not at all clear which of the appellants would have had standing to challenge the various alleged minimization inadequacies. Thus, even if the failure to minimize were to require total suppression of the wiretap evidence—an issue upon which we are not required to rule—certain wiretap evidence might very well have been admissible against certain of the appellants. See United States v. Poeta, 455 F.2d 117, 122 (2 Cir. 1972). Secondly, we do not know whether the government had clearly untainted evidence which, because of appellants' failure to make timely motions to suppress on minimization grounds or for strategic reasons, the government had no occasion to introduce.

Perhaps of chief importance, the timely disposition of such motions is critical to the orderly and fair administration of the criminal justice system itself. We will not countenance such deliberate and subtly disruptive tactics as those employed here. They would unnecessarily obfuscate the issues, confuse the jury and otherwise interfere with the judicial process. See United States v. Bennett, 409 F.2d 888, 901 (2 Cir. 1969), cert. denied, 396 U.S. 852 (1970). Cf. Nardone v. United States, 308 U.S. 338, 341–42 (1939).

It is well settled that unjustified failure to make a timely motion to suppress evidence pursuant to former Fed.R.Crim.P. 41(e) (now Rules 41(f) and 12), the provisions of which are analogous to Section 2518(10)(a), constitutes a waiver of that right. United States v. Ellis, 461 F.2d 962, 969 (2 Cir.), cert. denied, 409 U.S. 866 (1972); United States v. Blackwood, 456 F.2d 526, 529 (2 Cir.), cert. denied, 409 U.S. 863 (1972); United States v. Bennett, supra, 409 F.2d at 901; United States v. Weldon, 384 F.2d 772, 775 (2 Cir. 1967). This is so even when the district court, as here, considers the merits of the suppression motion as well as its timeliness. United States v. Nicholas, 319 F.2d 697 (2 Cir.), cert. denied, 375 U.S. 933 (1963); United States v. Volkell, 251 F.2d 333, 336 (2 Cir.), cert. denied, 356 U.S. 962 (1958). This rationale controls here.

Finally, we reject, as did the district court, appellants' contention that the finding of waiver here is inconsistent with the view that courts should "indulge every reasonable presumption against waiver of fundamental constitutional rights." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). We hold that appellants, by ignoring the district court's explicit directive to make their minimization motions before trial, elected to pursue a trial strategy of intentional relinquishment of a known right and the deliberate by-pass of the orderly and timely suppression procedure provided by Section 2518(10)(a). In doing so, they waived their right thereafter to challenge the admissibility of the wiretap evidence. Cf. Kaufman v. United States, 394 U.S. 217, 227 n. 8 (1970); Henry v. Mississippi, 379 U.S. 443, 450–51 (1965); Fay v. Noia, 372 U.S. 391, 438–39 (1963).

We have considered appellants' other claims of error and find them without merit.

Appellants were convicted more than a year ago after a fair trial on the basis of overwhelming evidence of serious crimes committed more than two and a half years ago. We order that the mandate issue forthwith.

Affirmed.